05-15-01529-CV;05-15-01530-CV; 05-15-01531-CV

ACCEPTED
05-15-01529-CV
FIFTH COURT OF APPEALS
DALLAS, TEXAS
12/16/2015 1:15:22 PM
LISA MATZ
CLERK

No. _____

FILED IN
5th COURT OF APPEALS
DALLAS, TEXAS
12/16/2015 1:15:22 PM
LISA MATZ
Clerk

# THE COURT OF APPEALS FOR THE FIFTH SUPREME JUDICIAL DISTRICT

# DALLAS, TEXAS

*In re Andrew Pete, Relator*

## 292nd CRIMINAL DISTRICT COURT
## Cause No(s): F1233559; F1233560; F1233561

## PETITION FOR WRIT OF MANDAMUS
## & MOTION FOR EMERGENCY STAY

**THE ALLEN LAW FIRM**
Scottie D. Allen
4144 N. Central Expressway
Suite 650
Dallas, Texas 75204
Telephone: (214) 824-7711
Facsimile:   (214) 824-7714
SBN: 01058020
*Attorney For Relator*

## IDENTITIES OF PARTIES AND COUNSEL

**Relator**:                                       Andrew Pete, Defendant

**Relator's Counsel**:                     Scottie D. Allen
                                                       4144 N. Central Expressway
                                                       Suite 650
                                                       Dallas, Texas 75204
                                                       Telephone: (214) 824-7711
                                                       Facsimile:   (214) 824-7714
                                                       SBN: 01058020


**Respondent**:                             Honorable Brandon Birmingham
                                                       292nd Judicial District Court
                                                       Frank Crowley Courthouse
                                                       133 N. Riverfront Boulevard, 6th Floor
                                                       Dallas, TX 75207


**Party In Interest**:                     Dallas County District Attorney
                                                       Susan Hawk
                                                       Frank Crowley Courthouse
                                                       133 N. Riverfront Boulevard, 11th Floor
                                                       Dallas, TX 75207
                                                       Telephone: (214) 653-3600
                                                       Facsimile: (214) 653-5774

# TABLE OF CONTENTS

Identities of Parties and Counsel………….........…………….………………......... 2

Table of Contents …….…..………………………………………….…..… 3

Index of Authorities……………………………….…..…………………………4

Statement of the Case……….……………………………….……………………5

Statement of Jurisdiction………………………….…..………………………….5

Issue Presented:

      DOES THE TRIAL COURT HAVE AUTHORITY TO GRANT A MISTRIAL
      AS TO THE PUNISHMENT PHASE ONLY?   ...……………….……………..... 6

Argument and Authorities……………………………………..…………… 6

    I.  STANDARD OF REVIEW………………………………………… 6

    II.  A POST-VERDICT MISTRIAL RETURNS THE CASE TO ITS
       ORIGINAL POSTURE BEFORE TRIAL COMMENCED ……………….….. 7

    III. TRIAL COURT DOES NOT HAVE AUTHORITY TO GRANT MISTRIAL
       AS TO THE PUNISHMENT PHASE ONLY   ……………………………… 8

    IV. EMERGENCY RELIEF IS NEEDED……. ……………………………… 9

Prayer……………………………………………………..…………….. 9

Certification…………………………………………………..…10

Certificate of Service……………………………………………..…10

Appendix ……………………………………………………………… 11

# INDEX OF AUTHORITIES

## Cases

*Dickens v. Second Court of Appeals,* 727 S.W.2d 542, 548 (Tex.Crim.App.1987) …………… 5,7

*Ordunez v. Bean, 579 S.W.2d 911, 913 (*Tex.Crim.App.1979*)* …………………………………. 6

*Smith v. Flack,* 728 S.W.2d 784 (Tex.Crim.App.1987) …………………………………………… 6

*State ex rel. Curry v. Gray,* 726 S.W.2d 125, 128 (Tex.Crim.App.1987) (op. on reh'g) ………...6

*Texas Board of Pardons and Paroles v. Miller,* 590 S.W.2d 142 (Tex.Crim.App.1979) ………. 6

*State ex rel. Skeen v. Tunnell,* 768 S.W.2d 765, 767 (Tex.App.—Tyler, 1989)…………………6

*State ex rel. Wade v. Mays,* 689 S.W.2d 893, 898–899 (Tex.Crim.App.1985) ……………......6,7

*State v. Evans*, 843 S.W.2d 576 (Tex.Crim.App.1992) …………………………………………… 7

*State v. Boyd*, 202 S.W.3d 393 (Tex.App. – Dallas, 2006) …………………………………………7

*State v. Garza, 774 S.W. 2d 724* (Tex.App.—Corpus Christi, 1989 no pet.)……………………..7

*State v. Bounhiza*, 294 S.W.3d 780, 786 (Tex.App. – Austin, 2009)…………………………… 7,8

*State v. Huseman*, 17 S.W.3d 704 (Tex.App. – Amarillo, 1999)………………………….......7,8

*State v. Doyle*, 140 S.W. 3d 890 (Tex.App. – Corpus Christi, 2004) …………………………….7

*State v. Bates*, 889 S.W.2d 306, 310 (Tex.Crim.App.1994)…………………………………….7,8

*State v. Hight*, 907 S.W.2d 845, 846 (Tex.Crim.App.1995)……………………………………..8

## Statutes

TEX. CRIM. PROC. ART. 44.29 ………………………………………………………………………8

Texas Rule of Appellate Procedure 52.3(j) …………………………………………….…10

**STATEMENT OF CASE**

Defendant, Andrew Pete, was indicted in the above entitled cause(s) and proceeded to a jury trial on April 22, 2015 (with prior counsel) wherein he was found guilty in all three causes. The Defendants' bonds were held insufficient and he was remanded to the custody of the Dallas County Sheriff where he remains at this time. During the punishment phase of the trial (prior to jury deliberation), the trial court granted a mistrial (*See* Trial Transcript, volume 7, p.131, attached as Exhibit "A"). In granting said mistrial, the Court declared the mistrial be limited to the punishment phase only. The Court also permitted counsel at the time to withdraw wherein the Defendant retained his current counsel. The State did not appeal.

Defendant is currently set for trial before a jury (punishment only) on January 4, 2016; however, the Court is attempting to proceed with jury selection this week [December 14th - December 18th].

On December 4, 2015, Defendant filed a Writ of Habeas Corpus and Motion to Reinstate Bond (attached as Exhibit "B"), specifically contending the trial court did not have the authority to limit the Order granting mistrial to the punishment phase only and that the case i.e. bond status should be restored to its original posture and The Defendant released. The Court issued an Order denying same.

On December 14, 2015, Defendant filed a Notice of Appeal (attached as Exhibit "C") and this Writ follows.

**STATEMENT OF JURISDICTION**

The courts of appeals have mandamus jurisdiction over criminal law matters concurrent with the mandamus jurisdiction of the Texas Court of Criminal Appeals. *Dickens v. Second Court of Appeals,* 727 S.W.2d 542, 548 (Tex.Crim.App.1987). Since this petition seeks an Order compelling the trial Court to release Mr. Pete, this Court properly has jurisdiction.

## ISSUE PRESENTED

The issue for review is whether the trial court has authority to grant a mistrial as to the punishment phase only?

## ARGUMENT AND AUTHORITIES

### I.    STANDARD OF REVIEW

The court of appeals has mandamus jurisdiction in criminal law matters concurrent with the court of criminal appeals. *Dickens v. Court of Appeals for the Second Supreme Judicial District of Texas,* 727 S.W.2d 542 (Tex.Crim.App.1987). To obtain relief through writ of mandamus, a relator must establish the following: 1) no other adequate remedy at law is available and 2) the act he seeks to compel is ministerial, rather than discretionary in nature. *Id*. at 548; *See also Ordunez v. Bean,* 579 S.W.2d 911, 913 (Tex.Crim.App.1979).

In the present case, Defendant can meet the first element of the *Dickens* requirement since he has no other adequate remedy at law to address his current unlawful confinement. The second element can be satisfied as well, as it relates to a wholly ministerial act. An act is 'ministerial' if it constitutes a duty clearly fixed and required by law and if the duty to be performed is described with such certainty that nothing is left to the exercise of discretion or judgment. *Smith v. Flack,* 728 S.W.2d 784 (Tex.Crim.App.1987); *State ex rel. Curry v. Gray,* 726 S.W.2d 125, 128 (Tex.Crim.App.1987) (op. on reh'g); and *Texas Board of Pardons and Paroles v. Miller,* 590 S.W.2d 142 (Tex.Crim.App.1979). The court has authority to issue a writ of mandamus to compel a trial judge to perform an act where trial judge has a clear legal duty, ministerial in character, as distinguished from discretionary, to perform the act. *State ex rel. Skeen v. Tunnell,* 768 S.W.2d 765, 767 (Tex.App.—Tyler 1989, original proceeding); *Flack,* 728 S.W.2d at 789; and *State ex*

*rel. Wade v. Mays,* 689 S.W.2d 893, 898–899 (Tex.Cr.App.1985). Here, the Appeals Court(s) have issued multiple opinions, holding the trial court lacks authority to limit an order granting mistrial to punishment only (See authority referenced below). This matter is not within the discretion of the trial court and a writ of mandamus shall be issued to compel the judge to return the case to its original posture.

## II.   A POST-VERDICT MISTRIAL RETURNS THE CASE TO ITS ORIGINAL POSTURE BEFORE TRIAL COMMENCED

The Court of Criminal Appeals and Court of Appeals have addressed the effect of granting a mistrial during the guilt-innocence phase and during the punishment phase. In said cases, the Appeals Court(s) have held that an order granting a mistrial is the functional equivalent of an order granting a new trial. Specifically, a post-verdict mistrial ruling is functionally indistinguishable from an order granting a new trial. *State v. Evans*, 843 S.W.2d 576 (Tex.Crim.App. 1992); *State v. Boyd*, 202 S.W.3d 393 (Tex.App. – Dallas, 2006); *State v. Garza, 774 S.W. 2d 724* (Tex.App.— Corpus Christi, 1989 no pet.); *State v. Bounhiza*, 294 S.W.3d 780, 786 (Tex.App. – Austin, 2009); *State v. Huseman*, 17 S.W.3d 704 (Tex.App. – Amarillo, 1999); and *State v. Doyle*, 140 S.W. 3d 890 (Tex.App. – Corpus Christi, 2004). Accordingly, the post-verdict mistrial granted in this case shall be treated as an order granting a new trial and we should proceed accordingly.

In the present case, the trial court is attempting to limit their order granting mistrial as to punishment only; however, as referenced above, a mistrial (even in the punishment stage) effectively serves as an order granting new trial and returns the case to its original posture before trial commenced. *See Bounhiza*, 294 S.W.3d 780; and *Huseman*, 17 S.W.3d 704. As such, the post-verdict mistrial in this case set aside the jury's verdict of guilty and a new trial shall be ordered.

*State v. Garza, 774 S.W. 2d 724, 726* [holding a post-verdict mistrial returned the case back to its original posture, setting aside the guilty verdict and ordering a new trial granted].

### III. TRIAL COURT DOES NOT HAVE AUTHORITY TO GRANT MISTRIAL AS TO THE PUNISHMENT PHASE ONLY

As noted above, the trial court is attempting to limit their order granting a mistrial as to the punishment phase only; however, the trial court lacks the authority to do so. *State v. Bates*, 889 S.W.2d 306, 310 (Tex.Cr.App.1994); *State v. Hight*, 907 S.W.2d 845, 846 (Tex.Cr.App. 1995). *See also Bounhiza*, 294 S.W.3d at 786; and *Huseman*, 17 S.W.3d 704 [holding trial court had no authority to grant a mistrial limited to the punishment phase only after plea of guilty].

In *Bounhiza*, the defendant was similarly convicted by a jury of sexual assault; however, before convening for punishment, defendant moved for a mistrial (based on ineffective assistance of counsel) and it was granted, returning the case to its original posture before trial. The State appealed, contending the trial court should have chosen to impanel a new jury for a punishment hearing rather than grant a mistrial. The Court of Appeals dismissed the State's argument and held the trial court lacked authority to call a new jury for punishment hearing after the mistrial was granted wherein said ruling returned the case to the posture it was in before trial.

Furthermore, having established that an order granting a mistrial is the functional equivalent of an order granting a new trial, we can look to *State v. Hight* for further guidance. In *Hight*, the Court of Criminal Appeals is clear, the trial court cannot grant a new trial as to the punishment phase only [overruling the Court of Appeals who held a new trial as to punishment only (after jury returned a guilty verdict) served the "interest of justice" and would avoid wasting judicial assets]. Instead, *Hight* held *only* the appellate courts may grant new trials as to punishment. *Hight* goes on further to say that trial courts are not listed among the courts which may grant a new trial solely on the issue of punishment pursuant to TEX. CRIM. PROC. ART. 44.29, and had the legislature

intended for trial courts to have such authority, they would have included "trial courts" in the amendment to said article. *Id*. at 846, 847.

Based on the aforementioned, the trial court in this case lacked authority to grant a mistrial as to punishment only and the case should be returned back to its original posture before trial commenced (therein re-instating the bond).

## IV. EMERGENCY RELIEF IS NEEDED

The trial court is intending on proceeding with trial on Monday, January 4, 2016; however, Defendant believes it is imperative the trial court abate all proceedings to allow this Court to rule on this matter before proceeding to a trial on punishment.

## PRAYER

Pursuant to the aforementioned, Defendant, Andrew Pete respectfully prays this Court grant this Request for Emergency Stay, grant this Petition for Mandamus and order the trial court to vacate the verdict of guilty, release Mr. Pete from custody and return the case to its original posture and proceed with a new trial.

Mr. Pete further prays for any and all other relief as appropriate and to which he is entitled.

Respectfully Submitted,

/s/ *Scottie D. Allen*
Scottie D. Allen
4144 N. Central Expressway
Suite 650
Dallas, Texas 75204
Telephone: (214) 824-7711
Facsimile: (214) 824-7714
SBN: 01058020
**ATTORNEY FOR RELATOR**

## CERTIFICATION

Pursuant to Texas Rule of Appellate Procedure 52.3(j), undersigned counsel certifies that he has reviewed the petition and concluded that every factual statement in the petition is supported by competent evidence included in the appendix.

  /s/ *Scottie D. Allen*
Scottie D. Allen
Attorney for Relator

## CERTIFICATE OF SERVICE

I hereby certify that a true and correct copy of the above foregoing Petition for Writ of Mandamus and Motion for Emergency Stay was served on the following parties via hand delivery on this the 16th day of December, 2015.

**RESPONDENT**
Honorable Brandon Birmingham
292nd Judicial District Court
Frank Crowley Courthouse
133 N. Riverfront Boulevard, 6th Floor
Dallas, TX 75207

**PARTY IN INTEREST**
Dallas County District Attorney
Susan Hawk
Frank Crowley Courthouse
133 N. Riverfront Boulevard, 11th Floor
Dallas, TX 75207
Telephone: (214) 653-3600
Facsimile: (214) 653-5774

  /s/ *Scottie D. Allen*
Scottie D. Allen
Attorney for Relator

**THE COURT OF APPEALS FOR THE FIFTH SUPREME JUDICIAL DISTRICT**

**DALLAS, TEXAS**

*In re Andrew Pete*

**292nd CRIMINAL DISTRICT COURT**

**Cause No(s): F1233559; F1233560; F1233561**

# APPENDIX

Relator submits the following documents in support of Petition for Writ of Mandamus:

Exhibit "A": Trial Transcript, Volume 7, page. 131

Exhibit "B": Writ of Habeas Corpus and Motion to Reinstate Bond

Exhibit "C": Order Denying Writ of Habeas Corpus and Motion to Reinstate Bond

"Certified Copy"

Exhibit "D": Notice of Appeal

*In re Andrew Pete, Relator*

**292nd CRIMINAL DISTRICT COURT**

**Cause No(s): F1233559; F1233560; F1233561**

# EXHIBIT "A"

# Trial Transcript, Volume 7, page. 131

REPORTER'S RECORD
VOLUME 7 OF 8 VOLUMES
COURT CASE NOS. F12-33559-V, F12-33560-V & F12-33561-V

| THE STATE OF TEXAS | * | IN THE 292ND JUDICIAL |
| | * | |
| VS. | * | DISTRICT COURT OF |
| | * | |
| ANDREW PETE | * | DALLAS COUNTY, TEXAS |

*************************************************

PUNISHMENT PHASE

*************************************************

On the 28th day of April, 2015, the following proceedings came on to be heard in the above-entitled and numbered cause before the Honorable Quay Parker, Judge presiding, held in Dallas, Dallas County, Texas.

Proceedings reported by machine shorthand method.

A P P E A R A N C E S

MS. VERIME SUMMER ELMAZI
Assistant District Attorney
SBOT NO. 24042652
MS. SNEHA PATEL
Assistant District Attorney
SBOT NO. 24035550
Frank Crowley Courts Building
133 North Riverfront Boulevard, LB 19
Dallas, Texas   75207
(214) 653-3600

        ATTORNEYS ON BEHALF OF THE STATE OF TEXAS

MR. GEORGE WILLIAM TENNANT
Attorney at Law
SBOT NO. 24042016
723 Main Street, Suite 704
Houston, Texas 77002
(281) 946-8042

        ATTORNEY ON BEHALF OF THE DEFENDANT

CHRONOLOGICAL INDEX – VOLUME 7
PUNISHMENT PHASE

April 28, 2015                                  PAGE      VOL.

Proceedings..............................      5        7

| State Witnesses | Direct | Cross | VD | Vol. |
|---|---|---|---|---|
| Jasmyn Witherspoon | 6 | -- | | 7 |
| Rotonia Witherspoon | 12 | -- | | 7 |
| Cornisha Riley | 17 | 22 | | 7 |
| Patrice Riley | 25 | 28 | | 7 |

State Rests..............................     29        7

Defendant Admonished on Right to Testify..    30        7

| Defense Witnesses | Direct | Cross | VD | Vol. |
|---|---|---|---|---|
| Rayford Pete | 32,47 | 38 | | 7 |
| Elva Pete | 49 | -- | | 7 |
| Pastor Alan Patterson | 61,78 | 66 | | 7 |
| Audrey Marie Robinson | 80 | -- | | 7 |

Defense Requests Motion for Mistrial......    86        7

| Defense Witness | Direct | Cross | VD | Vol. |
|---|---|---|---|---|
| Andrew Pete | 91 | 120 | | 7 |

Court Grants Mistrial....................    131       7

Proceedings Concluded....................    131       7

Reporter's Certificate...................    132       7

Disclosure...............................    133       7

ALPHABETICAL WITNESS INDEX

| Witnesses | Direct | Cross | VD | Vol. |
|---|---|---|---|---|
| Patterson, Pastor Alan | 61,78 | 66 | | 7 |
| Pete, Andrew | 91 | 120 | | 7 |
| Pete Elva | 49 | -- | | 7 |
| Pete, Rayford | 32,47 | 38 | | 7 |
| Riley, Cornisha | 17 | 22 | | 7 |
| Riley, Patrice | 25 | 28 | | 7 |
| Robinson, Audrey Marie | 80 | -- | | 7 |
| Witherspoon, Jasmyn | 6 | -- | | 7 |
| Witherspoon, Rotonia | 12 | -- | | 7 |

**P R O C E E D I N G S:**

(April 28, 2015; 11:36 a.m.)

(Open court, Defendant and jury present.)

MS. ELMAZI: The Rule's invoked.

THE COURT: Yeah. Anybody that's subject to the Rule, anybody that's testified earlier and will be testifying in this phase of the trial needs to step outside in the hallway. We'll call you when it comes your turn to testify.

(Witnesses exit courtroom.)

THE COURT: All right. Good morning.

(Responds.)

THE COURT: Again, ladies and gentlemen of the jury, we're finally under way this morning. So sorry for the delay. I think all of you have been well-informed by Officer Tilton and myself of what our delays have been. Glad to have you here. We're ready to start.

And you can be seated. Thank you.

And, Ms. Elmazi, would you call your first witness.

MS. ELMAZI: Your Honor, at this time, the State's going to call Jasmyn Witherspoon.

THE COURT: Okay. Ms. Witherspoon, come on in, if you would, please, ma'am, right up here to the witness stand.

And I'd like for the record to reflect this witness has been previously sworn, has previously testified in this case.

Go ahead and have a seat there, please.

MS. ELMAZI:  May I proceed, Judge?

THE COURT:  Yes, ma'am, please.

MS. ELMAZI:  Thank you.

**JASMYN WITHERSPOON,**

having been previously duly sworn, further testified as follows:

**DIRECT EXAMINATION**

BY MS. ELMAZI:

Q    Jasmyn, I know you testified for us once before. Once again, will you please state your name and spell it for the record.

A    My first name is Jasmyn.  That's spelled J-a-s-m-y-n.  My last name, Witherspoon.  That's W-i-t-h-e-r-s-p-o-o-n.

Q    And you are the same Jasmyn Witherspoon who testified in the guilt/innocence portion last week; is that right?

A    Correct.

Q    Okay.  And so the same rules apply.  You're under oath, okay?

A    Okay.

Q And -- so late yesterday afternoon were you in the courtroom when the jury rendered their verdict and found the Defendant guilty of each of the indictments involving you as the complainant?

A Correct.

Q And you understand this is the punishment portion?

A Yes.

Q All right. So, Jasmyn, you told us last week that you were employed?

A Yes.

Q All right. Now, I want to focus specifically on how the Defendant's actions have affected your life since you were 12, all right. I want you to tell this jury how it's affected you on a day-to-day basis, week-to-week basis, etc. Can you do that for us today?

A I can.

Q Okay. Tell this jury what's gone on in your life.

A All right. Well, growing up I dealt with anxiety. I went through moments where I was depressed. I had my highs, and I had my lows. But when I was a teenager, I held everything in. So people that I went to school with, they didn't know exactly that I was going through anything. They didn't even know that I wasn't a

virgin. They thought I was a virgin because I held everything in so much. But once I got to a certain age and once I talked to my mother about things, I just broke down. And, eventually, I did go to counseling. That's not something that I wanted to do because I felt like me talking about things from my past is just going to make things worse. So I did end up -- stopped going to counseling. I may go back again because I -- I know that it's something that I do need. I still go through depression -- depression sometimes. I have -- I doubt myself at times because of those things that I've gone through. And sometimes I am a bit paranoid.

Q Okay. So let's talk about some of those things you just told the jury about. You told us you go through depression. What makes you depressed?

A Well, just thinking about the things that I've done, things that were done to me. That's nothing that a young girl should have to go through. Even the fact that -- even when he wasn't around, I still dreamt about him. Whether it was a good dream or a nightmare, he was in my dream. I didn't want him to be in my dreams. And that led me to feel like I wasn't worthy. Just him comparing me to certain porn stars or having me watch those things, touching my body and me allowing it, made me feel like I was somebody -- I don't know -- off the

streets. Maybe like a -- I'll say the word -- a whore. It made me feel like a whore.

Q So you were under the age of 17 when he did all these things to you; is that right?

A Right.

Q And you understand you were a child --

A Yes.

Q -- right?

A Correct.

Q So why do you feel like you're responsible for this grown man's actions on you?

A At the time I felt like I was the only one that he was doing those things to. And I -- I knew that he had a sickness. I knew there was something wrong with him. And I felt bad for him. It seemed like he was addicted. I felt like a drug lord that's continuously giving this drug addict drugs, knowing good and well that that's something that is hurting him.

Q Now, you also talked to us about feeling paranoid. What does that paranoia mean? What exactly do you mean when you say that?

A Well, there are times where I just don't -- I just didn't feel safe knowing that, okay, this guy is hurting -- he hurt me as a young girl, sexually. He sexually abused me. And whenever I found out, okay, this

is something he did to someone else and he's still out there -- he's not in jail -- and I knew how controlling he was and how he would just kind of pop up, so I would be paranoid that maybe one day he's just going to show up and I wouldn't know how to react or it would just be me and him.

Q    Has it been traumatizing being here the last two weeks, having to see him on a day-to-day basis?

A    I'll be honest, at first, I was afraid.  I was very traumatized.  But as of now, seeing him and -- this is how I truly feel.  I feel that -- just hearing all the lies, he's a coward.  And I feel stronger.  And I'm not afraid.

THE WITNESS:  I'm not scared of you.

MS. ELMAZI:  Judge, I'll pass at this time.

THE COURT:  All right.  Thank you.

MR. TENNANT:  Your Honor, we have no questions for this witness.

THE COURT:  All right.  Thank you, ma'am. You can step down.

Call your next witness, please.

MS. ELMAZI:  Your Honor, may Ms. Witherspoon be excused from the Rule?

THE COURT:  Yes.

Any objection to Ms. Witherspoon being

excused from the Rule?

MR. TENNANT:  No, ma'am, she can -- I mean no, sir.

THE COURT:  Thank you, Ms. Witherspoon. You're free to stay in the courtroom.  You're excused.

MS. ELMAZI:  Your Honor, at this time, the State's going call to Tonia Witherspoon.

THE COURT:  Okay.

MR. TENNANT:  Your Honor --

THE COURT:  Yes.

MR. TENNANT:  -- just for a second. Briefly.

(Witness enters courtroom.)

THE COURT:  Come on in, Ms. Witherspoon. Go ahead and have a seat on the witness stand for me, if you would, please.

(Bench conference; off the record.)

THE COURT:  Officer Tilton --

THE BAILIFF:  Yes, sir.

THE COURT:  -- could you take the jury into the hall for just a moment here --

THE BAILIFF:  All rise.

THE COURT:  -- and let me take care of a little situation here.

THE BAILIFF:  Yes.

THE COURT: Thank you, Ms. Witherspoon. You can just step out for a minute.

(Court in recess; 11:45 - 11:49 a.m.)

(Open court, Defendant and jury present.)

THE COURT: Thank you, Ms. Witherspoon.

You may be seated.

Ladies and gentlemen, be seated. I'd like for the record to reflect this witness has been previously sworn and has previously testified.

MS. ELMAZI: May I proceed, Judge?

THE COURT: Ms. Elmazi.

MS. ELMAZI: Thank you.

**ROTONIA WITHERSPOON,**

having been previously duly sworn, further testified as follows:

**DIRECT EXAMINATION**

BY MS. ELMAZI:

Q    Good afternoon -- or morning, I guess, still, Ms. Witherspoon. Once again, state your name and spell it for the record.

A    Rotonia Witherspoon; R-o-t-o-n-i-a, W-i-t-h-e-r-s-p-o-o-n.

Q    And you are the same Rotonia Witherspoon who testified last week and has been testifying in these proceedings; is that right?

A    Yes.

Q    Okay.  Now, Ms. Witherspoon, you were here in the courtroom yesterday and heard the jury render their verdict of guilty in each of the indictments; is that right?

A    Yes.

Q    Okay.  And you know that at this point we're in the punishment phase.  And this is your opportunity to explain to the jury how the Defendant's actions have affected your life and your daughter's life.  Will you please do that.

A    Well, since learning what happened to my daughter, I have not dated.  I won't date.  I feel guilty for even having the desire or the ability to date.  My daughter is 23 years old.  She's never dated.  The only experience she's had with a man is from someone who molested her.  So dealing with that every day, she second guesses herself on everything.  She doesn't do things that a normal 23-year-old would be doing.  We still live together.  She'd like to be more independent, but, of course, I'm a little bit more -- I'm even more so protective of her now.  My daughter doesn't have the confidence that she should have.  She has a lot of support from people.  People think that she's a lot younger than what she is.  She's very -- very smart, mature, but she's

still a little innocent, because we've continued to shelter her, my family and myself.

I'm not that old, but I act older than what I am because of what we go through and what we deal with. I'd like to be able to not have as much guilt, but I'll take the guilt. I'll take the guilt if it means that my daughter can move forward with her life, because I am guilty because I invited this monster into my life. And I'll have to deal with that for the rest of my life. And that's fine. I'll take it, as long as she's able to be -- to grow up and mature and experience things and have confidence and to feel safe. I'll take the guilt. I'll carry it. And that's what we deal with each day, just taking one day at a time, trying to enjoy life and trying to grow.

Q   You said you feel guilty. Why do you feel guilty that this grown man hurt your baby girl?

A   Because I encouraged her relationship with him. I encouraged the father/daughter relationship. I wanted her -- I wanted it so bad. I thought that it was in her best interest, and I believed it when he said he loved her like his child and when he asked her to call him dad. I believed him. So I do feel guilty because as she was growing, she was developing her own personality, and I should have paid closer attention to that. So, yeah, I

invited him into my life, which -- I invited him into my life, had a relationship with him. And this is what he does to my child. So, yes, I do feel guilty.

Q How do you think his actions are going to affect -- or let me ask it like this: Do you think his actions, from all those years ago, are going to affect your life and your daughter's life for the rest of your lives?

A Yes. Because when I get to a point where if I do meet someone or want to date, I have to explain to them why there are certain things I just can't envision myself doing, being affectionate, being intimate. Because the thought of a man touching me makes me think of my daughter being touched in that way as a child. And those are the things that wake me up out of my sleep at night, so I'm always going to have those images. Even though I never saw it, I know it happened. So it's going to affect me for the rest of my life and hers. And I just pray that she'll be able to have a normal life, meet someone who's patient -- it's going to have to be someone who's loving and kind, who can accept and help her deal with the things that she's been through.

MS. ELMAZI: Judge, I'll pass at this time.

THE COURT: All right. Any cross-examination of this witness, Mr. Tennant?

MR. TENNANT: No, sir. We have no questions from this witness at this time.

THE COURT: All right. Thank you, Ms. Witherspoon. You may step down.

MS. ELMAZI: May Ms. Witherspoon be excused from the Rule at this time, Judge?

THE COURT: Any objection, Mr. Tennant, to Ms. Witherspoon being excused?

MR. TENNANT: No, sir.

THE COURT: Thank you.

Ms. Witherspoon, you may remain in the courtroom. You're excused.

Call your next witness, please, ma'am.

MS. ELMAZI: Yes, Your Honor. At this time the State will call Patrice.

THE COURT: Patrice Riley.

MS. ELMAZI: I'm sorry. One moment, Judge.

THE COURT: Sure.

MS. ELMAZI: I take it back, Judge. We're going to call Cornisha Riley first.

(Witness enters courtroom.)

THE COURT: All right. Thank you. Let the record reflect that Ms. Patrice Riley has already been sworn.

MS. ELMAZI: It's actually Cornisha Riley.

THE COURT: Oh, I'm sorry. Cornisha Riley, I'm sorry.

MS. ELMAZI: I switched it up a little bit. I apologize.

THE COURT: I'm sorry, Ms. Riley.

THE WITNESS: Yes, sir.

THE COURT: Let the record reflect that Ms. Cornisha Riley has already been sworn, has already testified.

You may proceed.

MS. ELMAZI: Thank you, Judge.

**CORNISHA RILEY,**

having been previously duly sworn, further testified as follows:

**DIRECT EXAMINATION**

BY MS. ELMAZI:

Q   Cornisha, state your name, again, and spell it for the record.

A   It's Cornisha Riley, C-o-r-n-i-s-h-a; last name, R-i-l-e-y.

Q   And you are the same Cornisha Riley that has testified in these proceedings this past week and this week; is that right?

A   Yes, ma'am.

Q   Okay. So I asked this earlier of the other

witnesses. But were you here in the courtroom yesterday afternoon when the jury delivered their verdicts?

A    Yes, I was.

Q    And you heard the Defendant has now been found guilty of all three offenses?

A    Yes, I have.

Q    Now, this is the punishment phase of trial. And so understanding that the Defendant is not indicted for the offenses involving you --

A    Yes.

Q    -- will you please tell the jury how the Defendant has affected your life since 1999 and how it's affected you on a day-to-day basis with what he's done.

A    Honestly, I'm a lot more cautious about everything that I do. I don't sleep at night, as I said before; I don't. If I don't take something for my insomnia, I don't sleep. Sometimes I don't take it on purpose just to hear the creaks and cracks, if we have visitors in the house. Because I don't trust anybody with my little girl and my little boy.

It has me with PTSD and anxiety that I have to take medicine for that hinders me sometimes. It hinders me from being at work around a lot of people. I can't focus if there's a lot of things going on, because I'm trying to pay attention to everything. It's made me

be aware of a lot of things and how cruel the world really is. Young like that, you don't look at things like that until something tragic happens to you. You'll change your whole logic, the way you're thinking of anything, really.

In the beginning, I rebelled so bad just because I didn't want to live any more. I didn't want to hold the weight on my shoulders. I didn't want my mom to bear the pain. I didn't want her to feel like she failed as a parent when she worked her butt off. And I feel like this is what -- that's what was played against me to keep me quiet. And it worked. Because even still when we're going through all of this and she finally broke down to me, I just had to scream and tell her, just stop, this is why I didn't say anything. She's been through enough. And I know it's supposed to be the other way around, but I don't like to see my mom hurt.

My brother, he is still hurting from all of this. He is rebelling, back and forth in jail, which is why he couldn't be here for me. And when I asked him has anything happened to him, he -- he still won't tell me. He gets angry like I did when I was asked, so I don't know. But I know he's not the same little brother at all.

Q   Cornisha, you were about 12, 13 when all this stuff happened, right?

A   Yes, ma'am.

Q   And you finally -- you didn't say anything until you were about 16?

A   Yes, ma'am.

Q   All of that time that the Defendant spent with you, do you think that it has had an effect on your day-to-day existence, even though he's never -- he hasn't been in your life since you were 16?

A   I watch over my back all the time.  I watch over my back all the time.  And it was because -- even after everything was said and done and he was out of the picture, I still got private phone calls.  I still -- you know, I was at work at Walmart and he found me at work at Walmart.  Found out I was at the beauty college I was at. I -- it's like I couldn't escape it.  And I remember us talking when his brother handed me the phone and I let him know I forgive him.  I have to.  Because as long as I held on to that grudge -- I was angry.  I was hurt, and I didn't want to take that out on my children.  I didn't want to be impatient with them.  So I had to get on my knees and pray about this hard.  It took a couple of years.

Q   Do you forgive him for what he did?

A   I don't know if I can say this, so please stop me if I go too far.  The only reason I forgive him is because I feel he's -- don't have his right mind hisself.

If you watch your father mess with your sister every day and get beat for being caught with it, I don't know how my mom would be either. That's the only reason why I prayed every day that it just go away, why can't I just have the good stepfather that I had at one point.

THE WITNESS: Why did you have to take it there? You ruined that for me. You ruined that for me.

A And then I don't even trust my own dad with my kids. I don't. He cannot have them alone. I'm sorry.

Q (By Ms. Elmazi) Has it been hard seeing him every day the last two weeks?

A Honestly, I -- if I get in trouble for this, oh, well -- since I was revoked and I got back on my probation and I'm doing good, this week I have been drinking every day because even my sleeping pills don't put me to sleep. I've been drinking at night. It helps wind me down, clear my mind.

Q Why have you -- you know you can be sent to jail for doing that?

A Dealing with this and everything in my head -- if it wasn't for my children, I, honestly, wouldn't care. I wouldn't care if it wasn't for my babies that I have to be out here and be right for. Because to try to deal with this every day in your head, it takes a toll on you. I'm only 27, and I feel like I'm -- I feel like my body is 50.

MS. ELMAZI: I'll pass at this point, Judge.

THE COURT: Any questions, Mr. Tennant?

MR. TENNANT: Unfortunately, Yes, Judge.

THE COURT: Okay. Go ahead.

**CROSS-EXAMINATION**

BY MR. TENNANT:

Q You said something earlier that -- I didn't really want to ask any questions. But are you saying that your own -- your own issue right now is your probation and that's why you're making the statement on the stand? We talked -- the -- he's been found guilty. And we're talking to you now. Are you -- maybe I misunderstood. When you said that if you get in trouble, oh, well, what were you talking about?

A Excuse me? As far as my probation.

Q Is that --

A And I'm not suppose to have a drink.

Q Is that the only --

A That is the only thing that I'm doing that I have no business -- if that's what you're referring to.

Q So -- we're in punishment, okay. You're saying that there's nothing else pending that you're -- that you're trying to avoid?

MS. ELMAZI: Judge, I'm going to ask to

approach at this time.

MR. TENNANT: She opened the door on this.

MS. ELMAZI: No.

Judge, I'm going to ask to approach at this time.

THE COURT: Come on up here.

(Bench conference; off the record.)

THE COURT: All right. Ladies and gentlemen of the jury, if you'll disregard the last statement of the witness.

MR. TENNANT: And for purposes of clarity, disregard is about the drinking and the --

THE COURT: About the drinking and probation and whatever it was she just said.

MR. TENNANT: Okay.

THE COURT: Okay?

MR. TENNANT: Yes.

Q   (By Mr. Tennant) You said -- one thing that I heard for the first time -- this is more so for us -- my piece of mind, actually. You said your brother -- watching your brother -- watching your dad molest your sister. What did you mean? Could you elaborate, please?

A   Watching the dad molest his sister.

Q   Watching your dad molest your sister and getting beat because of it. What was that about?

A I didn't say that I watched my dad molest my sister. I said I felt sorry for Andrew Pete because his father molested his sister growing up, is what I said. He cried to us about that --

Q And you knew --

A -- that he hated his father so much because of what he was doing to his sister. But yet -- and still he turn around and do it worse because he know the outcome of what had -- what happened with her, how she took it. And he didn't care to do it to me --

Q No one's --

A -- or Jasmyn.

Q No one's heard that before, but thank you very much.

MR. TENNANT: No further questions.

THE COURT: Any further questions of this witness?

MS. ELMAZI: Nothing further from this witness, Judge.

THE COURT: All right. Thank you, ma'am. You can step down.

MS. ELMAZI: Your Honor, at this time the State's going to call Patrice Riley.

THE COURT: Any objection to this witness being excused from the Rule?

MS. ELMAZI: No, Judge.

MR. TENNANT: Absolutely not, Judge.

THE COURT: Okay. Thank you.

You're excused from the Rule, Ms. Riley.

(Witness enters courtroom.)

THE COURT: Come in, Ms. Riley, if you would, please, ma'am. Just come on down here to the witness stand. Have a seat.

I'd like for the record to reflect this witness has been previously sworn and has previously testified.

Go ahead and have a seat there for me, please, ma'am. Thank you.

You may proceed.

MS. ELMAZI: Thank you, Judge.

**PATRICE RILEY,**

having been previously duly sworn, further testified as follows:

**DIRECT EXAMINATION**

BY MS. ELMAZI:

Q   Good morning -- or good afternoon, Ms. Riley. Would you please state your name and spell it for the record?

A   Patrice Riley; P-a-t-r-i-c-e, R-i-l-e-y.

Q   And are you the same Patrice Riley who just

testified in the proceedings in the guilt/innocence proceedings against the Defendant, Andrew Pete?

A    Yes, I am.

Q    All right.  And so you're still under oath?

A    Yes.

Q    Okay.  Now, Ms. Riley, were you in the courtroom yesterday when the Defendant was found guilty of all three offenses involving Jasmyn?

A    Yes, I was.

Q    This is the punishment phase of trial, okay, and so this is an opportunity for the jury to know how the Defendant's actions have affected you personally, all right?  So I want you to take a second and let them know.

A    Throughout the trial?

Q    Throughout -- well, how have the Defendant's actions affected you on a day-to-day basis, a week-to-week basis, et cetera?

A    This situation has really, really, really taken me into a depressed stage, to see my daughter go through what she went through, you know, all these years.  So yesterday was a wonderful feeling for me.  Because even though this is not our case, I feel like he's at the moment of being stopped.  He can't do this to nobody else. Praying that he won't do this to nobody else, because those kids are innocent.  He had no business touching on

none of those children. It's heart breaking. Because it's like I -- it's -- he had already done it so it's nothing I can do to take it back to help my baby, to help heal her, but I had to get on my knees and ask God for forgiveness to forgive him in order for me -- not only me, to be able to pick her up, for us to move on with our life. Because if not, it's like he would have still won. It was like he still winning and taking control of both of our lives. I had to forgive him for my own self because it broke me down so bad. I've never been -- I've been hurt in my life, but this right here, it made me feel like I wanted to die, to allow someone to hurt my child. I never wanted no one else in my house after that. I never allowed another man to stay in my house until my children got grown. I didn't trust nobody. It was -- it was -- it was -- I was afraid. I didn't want it to happen to nobody -- you know, I have grandkids now. God forbid if it happened to one of them. I don't want to go through this ever again in my life, ever again in my life.

Q Do you think that the Defendant's actions have had horrible -- or continue to have an effect on you and your daughter's life -- lives?

A I really believe this has kind of -- for me to be here for this day, to see him in court, it's -- I was already trying to heal, but this is really going to help

me heal.  My county failed me, but Dallas, I appreciate y'all so much for allowing me and my daughter to be able to sit in this because he deserves punishment.  He deserves to be punished for what he did to these girls.  It's heart breaking to see them.  It's like when you look at them -- even to look at the other little girl, it's like -- I remember my daughter -- my daughter's -- the look that she have right now, my daughter had that same look for a long time.  You know, like shame -- like she's shamed to be in front of people or didn't want to say too much in front of people, you know.  Don't trust people.  They shouldn't have to go through that.  It's -- it's just not -- it's not fair.

Q    Thank you.

MS. ELMAZI:  Judge, I'll pass at this time.

MR. TENNANT:  Just one follow-up question.

THE COURT:  Yes, sir.  Go ahead.

**CROSS-EXAMINATION**

BY MR. TENNANT:

Q    Did you and Cornisha talk about any possible trauma between Andrew, his sister and his dad?

A    Have we talked about the trauma that they had?

Q    Yeah.

A    Yes, we've -- we've heard about the trauma in his family.

Q    When?

A    When he told us.

Q    When was that?

A    I can't remember dates.

MR. TENNANT:  Nothing further, Your Honor. Pass the -- thank you.  Thank you.

THE COURT:  Anything further?

MR. TENNANT:  Thank you for your time.

MS. ELMAZI:  Nothing further from this witness, Judge.

THE COURT:  All right.  Thank you, ma'am. You can step down.

And may this witness be excused?

MS. ELMAZI:  Yes, Judge, no objections.

MR. TENNANT:  No objection, Judge.

THE COURT:  All right.  Thank you.

You're -- you are excused, Ms. Riley.

MS. ELMAZI:  Your Honor, and ladies -- ladies and gentlemen of the jury, at this time the State will rest.

THE COURT:  All right.  Ladies and gentlemen of the jury, I know we just got started good, but it's 12:15.  I know you're getting hungry.  So we're going to break here for lunch.  I'm going to shorten your lunch period up a little bit.  Let's take an hour -- just

an hour. Can you be back at -- it's 12:15 now. Can you be back at 1:15, and then we'll continue with the punishment phase, all right? See you back here in an hour.

(Court in recess; 12:15 - 1:28 p.m.)

(Open court, Defendant present, no jury.)

THE COURT: Let the record reflect this hearing is being held outside the presence of the jury for purposes of admonishing the Defendant on his right to testify. And, also, his right to -- under the Fifth Amendment to not testify.

And, again, Mr. Pete, you understand that I -- as I told you early --

Hold on just a second.

THE BAILIFF: Yes, Your Honor.

THE COURT: As I told you earlier, you have an absolute right to testify in this case, if you choose to do so. In the event that you don't choose to do so, you have an absolute right, under the Fifth Amendment, not to testify. And would you please let me know if you intend to testify in this phase of the trial or not?

THE DEFENDANT: I do, sir.

THE COURT: You do plan to testify. All right. Very good. Thank you.

We're ready, Paul.

THE BAILIFF:  Yes, sir.

All rise.

(Jury enters courtroom; 1:29 p.m.)

THE COURT:  Thank you, ladies and gentlemen.  Be seated, please.

All right.  And welcome back, ladies and gentlemen of the jury.  We're ready to go and finish up this afternoon.

Mr. Tennant, call your first witness, please.

MR. TENNANT:  Yes, Your Honor.  The State -- the Defense calls Rayford Pete, Your Honor.

THE COURT:  Okay.  Rayford Pete, please.  You'll probably have to grab him since both of my bailiffs are occupied.

(Witness enters courtroom.)

THE COURT:  Come in, Mr. Pete, once again, for me, please, sir.  Just come on up here to the witness stand.

I'd like for the record to reflect this witness has been previously sworn.

Mr. Tennant --

MR. TENNANT:  Yes.

THE COURT:  -- you may proceed.

**RAYFORD PETE,**

having been previously duly sworn, further testified as follows:

**DIRECT EXAMINATION**

BY MR. TENNANT:

Q   Mr. Pete, the jury, after much deliberation, has found your brother guilty of the charges as accused, based on evidence they have.  How do you feel about that?

A   I think that the jury, with what they were presented, done a great job.  I have no ill will towards none of them.  I don't have to like it, but y'all done a fair job.  And it hurt.  It hurts.

Q   Now, for purposes of the record, I found out something for the first time a few minutes ago.  And -- can you tell me a little bit about you and Andrew growing up as kids?

A   We the -- we the youngest of seven.  I've heard Ms. Summers [sic] called my brother a monster.  We grew up where our father was molesting his sister.  My brother, the baby, was the only one there that tried to protect her.

Q   Mr. Pete -- I'm sorry -- how old were you was --

A   We was --

Q   Did he -- first of all, I got to say this for selfish reasons.  Why am I just now hearing about this and from a -- a State's witness at that?

A   My brother have always been -- tried to be a protector of everybody.  Some people -- he didn't want to go into our family history because it is a hurting thing.  And -- like I said, for him to be the youngest --

Q   How old was he, Mr. Pete, when he --

A   When all this first started, he couldn't have been no more --

Q   -- when he fought your dad?

A   He couldn't have been no more than, maybe, 11, 12 years old.

Q   And how old were you -- well, how old were you at that time?

A   I was a year older than him.  So if he was 11, I was 12.

Q   And your dad, is he small, big?

A   If you can see, we're both not -- we're not small men.

Q   He's bigger than y'all?

A   At that time, yes.

My dad would take my brother, put him in a closet and beat him like a grown man.  It's -- we have talked over the years.  We've shed a lot of tears.

Q   Okay.  I'm -- I'm -- let me ask the next question and just try to answer -- but you can talk, please.  So why do you believe -- I mean, if y'all -- he

was beaten by your dad.  Did he -- did you tell me earlier that he saw him in the act?

A    Yes.  He caught him on more than one occasion, yes.

Q    And how old was your sister at this time?

A    Had to have been about 13, 14.  She was 13 -- 13, 14.  My brother, like I said, he was the only one that actually tried to help, the only one.

Q    Including you?

A    Including me, even though we was a year apart. I just -- as a kid, it's hard to wrap your mind around something like that.  And, like I said, I heard Ms. Summer call him a monster.  I seen a true monster.  That's not one; that's not one.  I respect what you did with the evidence that was presented.

Q    You've said -- you've said that now.  I understand that.  But I've been pretty hard on -- especially, one of the State's witnesses.  And I just assume this was another lie.  So how did Patrice and Rotonia -- Rotonia know about this, because they -- they knew about this?

A    Latonia [sic] knew.  My brother actually --

Q    Personal knowledge.

A    Yes, this is personal knowledge.

Q    Only personal knowledge.

A    Yes.  She came home to Lake Arthur from the little town we from in Louisiana and we was all sitting in my mom and dad front room when it was discussed.

Q    Who is "she"?

A    Ms. Tonia.  Is that her (indicating)?

Q    Jasmyn's mom?

A    Yeah, Jasmyn's mom.  And this was talked about in our front room.  And -- I'm 46 now.  It's not something you get over.  It's not something that you forget about.  He's always been a protector of my -- my sister.

Q    So he fought to keep -- just to be clear, he -- fought -- he -- was -- was he molested?  Because that's what -- that's what -- that was the impression I kind of got.  There was a third rail not being said.  Is that the case?

A    No, no.

Q    So --

A    He was physically abused.  He --

Q    For -- for stopping molestation?

A    For trying to stop it, trying to.

Q    That explains -- I'll ask him then.  That explains the MMA, I guess.

A    Yes.

Q    Rayford, I had to go on the record with this for my purposes because this is something I should have known.

Now, is there anything else you need to tell us that I should have known about earlier?

A    Like I said, he's -- he's not a monster.  He's not a monster.

Q    I forgot the purpose -- if you can -- there was some things we talked about.  What was I -- we talked about some questions I was supposed to ask you.  Please help me with one of those so I can get back on track.

A    Yeah.  Give me -- give me a second, George.  Give me a second.  My -- my brother grew up -- my kids -- excuse me -- my kids grew up around my brother.  I got two girls.

Q    How old are they?  That's what I -- yes, thank you.

A    My oldest girl is 20 -- 24.  My youngest girl is 20.

Q    Why aren't they here today?

A    My youngest one her and her fiance couldn't make it because she's pregnant.  And because of her condition, she couldn't take this trip back and forth.  My oldest one is fixing to graduate from A&M in a couple of weeks.

Q    Congratulations.

A    And she had some final stuff she had to prepare for.  And my baby boy is in school.

Q    Okay.  Oh, I promise I was going to be short,

Rayford, so I'll give you a chance to ask a few more. But this jury specifically was seated out of -- because they said they could consider the full range of punishment. What are you asking for today? That's something I was supposed to ask you. And I'm sorry.

A I'm asking that you give him probation. He have never had a prior anything. This is his first. And I'm asking you to please consider that, please. Please give him chance to keep doing -- everybody that know him now know who he is, what kind of man he is. All I'm asking is to please give him a chance, please. That's all I'm asking. He's going to get -- he won't even get to see my son play peewee football, baseball, anything, no more. That's done with. He'll never be able to see his nephew do none of those things no more.

Q I'm going to keep you on point. I'm gonna -- that sounds -- I can assure you somebody from the State is going to say, well, what about the victims in this case, they lost a lot more, based on the evidence presented anyway.

A Ms. Summers asked me, at the beginning, if the -- if the State proved that -- beyond a reasonable doubt, would I be able to accept it. Yes, I can accept that. All I'm asking now is that you please take into consideration the man that he is. Please -- he's my

brother and I love him and I know what kind of man he is. I know what he is. I'm just asking you that -- to give him a chance.

MR. TENNANT: Thank you. Pass the witness. Your Honor, for purposes -- for purposes of the record -- I don't know if I can -- I don't know the answer to this. But can you take judicial notice about the fact that I'm just finding this out under penalty of perjury?

THE COURT: I believe you just found it out.

MR. TENNANT: Thank you, Judge.

THE COURT: Okay. Cross-examination.

MS. ELMAZI: Thank you, Judge.

**CROSS-EXAMINATION**

BY MS. ELMAZI:

Q    Okay. Mr. Pete, let me make sure I understand. There were seven children in your family; is that right?

A    Yes.

Q    And I don't have my notes in front of me. But what was the age range between the oldest and youngest? What's the age difference?

A    I want to say (inaudible) should be --

THE REPORTER: I'm sorry?

A    Thomas -- Thomas Pete, Jr. He should be at least 60.

Q    (By Ms. Elmazi) Okay.  So who-all lived in your house growing up when you lived with your brother?

A    We was the youngest.  So by then it was just me, him and my two sisters.

Q    What are your sisters' names?

A    Stella -- Stella Ann Pete and Adele Pete.

Q    And which sister was it that was molested?

A    Adele.

Q    Adele.  And your father actually had a child with your sister; is that right?

A    I don't know if that's -- no, that's not -- that's not right.

Q    So you're saying that your father did not get your sister pregnant?

A    No.

Q    Okay.  So Adele is two years older than your brother?

A    Two -- no, no.  Adele might be two years older than me.  Might -- I think she's three years or four years older than him.

Q    Okay.  So who-all lived in your house?  So it's Stella, Adele, you and Andrew?

A    Right.

Q    And your parents?

A    Right.

Q   Your mom and your dad?

A   Right.

Q   And so your father hurt or molested your sister, Adele?

A   Yes, ma'am.

Q   And do you know how old you were when you realized that was happening to Adele?

A   I was quite young.  I want to say, ma'am, I was about maybe -- say in the range of 11, 12, something like that.

Q   So 11, 12.  So your brother...

A   Was about 10 or 11.

Q   Okay.  And Adele was how old -- and how -- how old was she when it started, if you know?

A   I can't -- I can't say precisely when it started, but I believe she was around 13, 14 years old.

Q   And it went on for how long?

A   I would have to say at least until -- maybe a sophomore in high school.

Q   So it went on till she was about 16?

A   16, 17, yes, something like that.

Q   All right.  So you said it started when she was about 12 or 13?

A   Yes, ma'am.

Q   Until she was 16 or 17?

A    Uh-huh.

Q    And you know that the ages of Jasmyn and Cornisha were about 12 or 13 when the Defendant did that to them.  Are you aware of that?

A    No, ma'am, I didn't.

Q    So you said your brother tried to stop your father from hurting your sister?

A    Yes, ma'am.

Q    How old was he when he tried to do that?

A    Like I said, he was about around 10 -- 10 or 11.

Q    Okay.  How did he stop your dad from trying to hurt your sister?

A    The best a kid can, just -- just grab -- grab hold of what you can and --

Q    Tell me about a time that he tried to stop your dad from molesting your sister.

A    Okay.  There was one time -- they was in the -- we had a living area -- a living room area.  And we was in the back room.  And he heard my sister kind of crying.  And when he walked in there, he seen my old man on top of her.  And he hollered at him and then he jumped on him.

Q    Who hollered on who?

A    My brother did.

Q    And who jumped on who?

A    He jumped on my dad.

Q   And then what happened?

A   That's when my dad hit him, pushed him down.

Q   Okay.

A   From that forward, I just turned my head and went back into the room.

Q   Okay.  So you saw this happening, too?

A   Seen what --

Q   You saw your sister --

A   Yes, yes, ma'am.

Q   -- being molested by your dad?

A   Yes, ma'am.  Yes, ma'am.

Q   So your brother tried to stop -- stop him one time or more than one time?

A   That's the one time I recall, ma'am.

Q   Okay.  And you think he was about 10 or 11 when that happened?

A   Yes.

Q   Okay.  So did your other sister, Stella, did she know what was going on in the house?

A   To my knowledge, no.  Not at the time, no.

Q   Now, Mr. Rayford [sic], do you have any criminal history?

A   No.

Q   Have you ever been accused of aggravated sexual assault of a child?

A    No, ma'am.

Q    Do you have any allegations involving your own daughters?

A    No, ma'am.

Q    So you knew this was going on with your dad and you didn't end up to be a child molester, did you?

A    No, I did not.

Q    Okay.  So this man who supposedly went to go protect your sister, he had no qualms about hurting these girls, right?

A    I mean, what -- what do you want me to say?  I mean --

Q    Well, I want you to answer the question.  This man who stands here and who's been convicted of aggravated sexual assault of a child --

A    Right.

Q    -- who you say witnessed these vile acts that happened on your sister --

A    Yes, ma'am.

Q    -- and they are indeed vile --

A    Yes, they are.

Q    -- you didn't end up a child molester and you saw the same things happening, but your brother did.  So why does he get a break for that?  Tell this jury why he deserves a break for that when you didn't do it.

A    Ma'am, all I'm asking for is to give him a chance.

Q    So tell this jury how -- you two grew up in the same --

A    I --

Q    I want you to listen to my question.

A    I understand what you're saying.

Q    You two grew up in the same household.  And what your dad did, he should have been convicted for it.  Wouldn't you agree with that?

A    Yes.

Q    He should be punished for what --

A    Yes.

Q    -- he did to your sister, right?

A    Yes.

Q    But you grew up in the same household and you didn't do that to someone else.  So why does your brother deserve probation when you didn't even do anything -- and you saw the same things happening?

A    I think he deserve probation.  Because, like I said, this is his very first offense, very first.  There's nothing else that said he did this 300 times or 400 times.  This is his first offense.  And as the man that I know he is, if you give him a chance, he will abide by everything that the probation tells him to do.  I know he will.

Q    The fact is, Mr. Pete, this is the first time your brother's been held accountable.  It's not that he's never done this before.  It's the first time he's been held accountable; isn't that right?

A    You're asking me to say if he ever done it before?

Q    Let me -- let me clarify my question.

A    Okay.

Q    The Defendant was charged and indicted by the Dallas County District Attorney's office and this jury yesterday convicted your brother of committing --

A    Right.

Q    -- offenses against Jasmyn Witherspoon.

A    Right.

Q    Okay.  It's the first time he's been held accountable.  Just because it's the first time he's been held accountable doesn't mean it's the first time he's been -- been caught.

A    Well, I can't -- I can't speak on what -- I mean, I can't speak on something that you're saying he did.  I mean, are you saying that he was -- he did it before?

Q    Well, yes, I am saying that he did it before. You're aware of Cornisha -- of Cornisha's statements and allegations, right, against your brother?

A     But that's what it is.  It was allegations.  I didn't know he was convicted for that, too.

Q     Okay.  But he never got -- he was never held accountable for Cornisha's cases, right?  You understand that?  Temple never held him accountable for those cases?

A     Right.  I mean, from what I understand, he was never questioned about what happened in Temple.

Q     Why is it that you didn't try to stop your sister from being hurt?

A     Because I was young.  And I guess -- I was scared.  And then after what I saw, what happened to him, I didn't want it to happen to me.  I didn't want to get beat.

Q     Was your father ever charged or convicted for what he did to your sister?

A     No.

Q     So your sister never got justice?

A     No.

MS. ELMAZI:  Okay.  I'll pass the witness, Judge, at this time.

THE COURT:  Okay.  Any further questions?

MR. TENNANT:  Just one.

THE COURT:  Yes, sir.  Go ahead.

**REDIRECT EXAMINATION**

BY MR. TENNANT:

Q   Did -- you told me -- in the past you told me that Andrew was beaten a lot.  I didn't -- Pete -- I didn't know -- was that his last beaten -- or what's the worst beating you saw him take after that date, I guess?

A   Like I said, as a kid, he -- he took the blunt of the old man's hatred.  He took the blunt of everything. The old man was mad at something.  He took the blunt of everything.

Q   And you're a year older?

A   Yes.  I was considered the quiet one.

Q   How -- what was he considered?

A   If he saw something that was wrong, he spoke out against it.  And you just -- you just didn't do that with the old man.  You can see him doing something wrong, but you don't speak out against it.

Q   Now, I want to make sure the jury understands your standpoint because I thought it was really important. Do you agree with the verdict the jury made, based on the evidence they have?

A   Based on what you have, I agree, yes, I do.  I hold y'all no ill will.  You've done your job.  Now I'm asking you to please give him a chance.

Q   Now, let's deal with the 800-pound -- 250-pound gorilla in the room, I guess.  You're saying, based on the information you have, you feel like there's some

information I should have gotten in?

A    Yes.  There's a lot of information that should have went -- that should -- y'all should have gotten, a lot.

MR. TENNANT:  Pass the witness.

MS. ELMAZI:  I have nothing further, Judge.

THE COURT:  Okay.  Thank you.  Stand down, Mr. Pete.

May this witness be excused?

MR. TENNANT:  Yes, Your Honor.

MS. ELMAZI:  I have no objections.

THE COURT:  All right.  Okay.

MR. TENNANT:  We'll waive.

THE COURT:  Mr. Pete, you can stay in the courtroom.

Call your next witness, please, Mr. Tennant.

MR. TENNANT:  The Defense calls Elva Pete.

THE COURT:  Okay.  You might have to go get her.

MR. TENNANT:  Oh, yeah, right.  Sorry, Judge.

(Witness enters courtroom.)

THE COURT:  Come in, Ms. Pete.  If you will, please, ma'am, please stand here in the witness

stand here for me. Just go ahead and step up there and have a seat please, ma'am.

Let the record reflect this witness has been previously sworn and has previously testified.

Mr. Tennant, your witness.

**ELVA PETE,**

having been previously duly sworn, further testified as follows:

**DIRECT EXAMINATION**

BY MR. TENNANT:

Q   Okay.  Elva, I talked to your brother.  I really didn't get a chance to talk to you.  You've been the peacemaker between me and your husband a lot.  Why -- why am I hearing about this from the State's witness for the first time during punishment?  And the "this" -- you know what it is because you heard me talking to your brother.

A   Say it again.

Q   What -- why am I -- why is this the first time I'm hearing about the fact that -- or the -- well, the fact, yes, that his dad molested his sister; and, apparently -- possibly got her pregnant and he was beaten for it?  Is that true?

A   Yes.

Q   And all those talks 1:00, 2:00 in the morning, why am I -- why am I hearing about this now for the first

time --

A    Because --

Q    -- for the State bar?

A    -- one, it's hard to talk about that issue. Secondly, it had nothing to do with him.

Q    No, that's not -- that's not your call to make. I'm not trying to be aggressive.  You're my witness.  I appreciate this, but -- well, explain that, please.

A    It's a hard issue to talk about.

Q    All of this is hard to talk about.

A    Yeah.  And --

Q    Go ahead.  I'm sorry.

A    That's not something -- how can I put --

Q    For purposes of the record, what is the "that"? I need you to say what you know to be the event I'm talking about.

A    Oh, with his father and --

Q    How old?  Give me some ages, times.  What did he tell you?

A    Okay.  His father -- growing up, Andrew was a kid, his sister, older than him, would -- was molested by his father.  He, Andrew, would defend -- or try to defend her.  He was -- I think it started maybe around when he was 8 or 9.  And he would try to stop it and defend her so she wouldn't be hurt.  And -- but, of course, he's young.

He's a kid.  There's only so much he can do.  And he would get beat for it -- I mean, abused for it.

Q    You can get a chance to talk about this in a second.  Did he tell you this or did you hear this from some -- some -- some other -- like some other family members?  Is this something you heard from him?

A    I heard it from him.

Q    Before I walked off at lunchtime, you told me, briefly, when -- when did he tell you?

A    He told me about three to four months within us dating because he wanted me to understand the type of relationship that him and his father had.

Q    And what type of relationship was that?

A    It was a strained one because his father looked at him like -- like you know my dirt, you know, and -- and you're trying to stop me from doing what I want to do, so I don't like you.  So it was a strain.  His father didn't like him and he had to deal with that growing up.

Q    So he took you around his father?

A    Yes.  I met his father.  I met his mother.

Q    The horse is already out of the stable for this.  But did anybody from the State's witness list know about this --

A    From the -- say that again.

Q    -- like Jasmyn, Rotonia, Patrice, Cornisha?

A    To my knowledge, Tonia knew and --

Q    Tonia -- whose mother is that?

A    Jasmyn's mother.

Q    Okay.

A    And Cornisha's mom, Patrice.

Q    Now, physically, how -- how is your husband doing physically, to your knowledge?  You're not a doctor.  You're an engineer, but that's close I guess.

A    He's not doing good.  Physically, he has to deal with the left hip replacement.

Q    That doesn't sound very bad.

A    But here's the thing, he was in the hospital, having that replacement, and he had to go in and out of the hospital because he passed out.  Blood pressure went way down.  I thought I had lost him.  Then there was an issue with blood clots.  Like I said, he can't take the pill any more.  He has to take shots twice a day.  Blood clots.  I don't know if you know about it.  But if a blood clot travels to the wrong place, like your brain or to your heart or to your lungs, it can kill you like that.

Q    I'll let -- I'll let him explain in detail about that when he takes the stand.  And he's -- he's -- what about -- what's your view -- I'm sorry -- I forgot to ask the first question.  How do you feel -- we've talked about this last night.  How do you feel about the verdict?

A    I respect the verdict, based on what you guys heard.  You made the best choice that you felt that was needed and I respect it.

Q    So -- I mean, finish the -- the -- you know, I'm -- my role.  What did -- tell about the rest.  You said, what you guys -- what they heard.  Let's make it -- let's keep it -- get it all out.  It's the last day.

A    There's just some things y'all haven't -- y'all didn't get a chance to hear.  There's still some things y'all don't know.  I don't even know where to start at.  I mean, it's just -- my husband, he -- he been nothing but good to both of the women he dated prior to me, to both -- to all of the children that they had, especially to Jasmyn.  He treated her like -- not -- as if that was his daughter.  He acknowledged that.  She acknowledged him as being her dad.  And it got to a place where she would come and she would visit.  She even wanted to move in with him because she wanted to go to school at McNeese -- same college I went to -- but that didn't happen because she found out that we were getting married.  She wanted to be in the wedding.  And my husband said, well, if your mother approve of that, you're more than welcome to be in the wedding.  She called her mom --

Q    Now, I got to stop you there because -- on direct testimony earlier, you said that she walked out --

y'all were at a party --

     A     Yeah.

     Q     -- and she walked out to be alone.

     A     Yeah.

     Q     And then after the horse left the stable, why did she walk out to be alone?

     A     Well, she went to talk -- you know, to have a conversation with her mom.

     Q     About what?

     A     About the wedding, wanting to be in the wedding.

     Q     So that's why she isolated herself?

     A     Yeah.  Well, to have that conversation.  Yeah, and she was just -- her mom disagreed and said all kinds of things.  And -- towards me, towards Andrew, towards her own daughter, to the point where she was just distraught.  And me and Andrew had to deal with that.  We had to deal with her emotions and how she was feeling and all of that.

     Q     Anything else about -- what about -- have you talked to his sister -- Audrey or Stella -- whatever the name was?

     A     To whose sister?

     Q     Andrew's sister, the one that we were talking about today.

     A     Yeah.

     Q     Stella?

A    Her name is Adele.

Q    Okay.  I'm sorry.  Have you talked to her about this?

A    I've talked to -- I talked to his mom and dad. I've talked to the sister.  It's -- everybody recognizes in the family what happened.  It's just that it's been a strained relationship.

Q    When you say everybody recognizes what happened -- perhaps I should have asked this on direct -- but elaborate please.

A    Okay.  Her family knows what has happened with the father and the daughter.  The mom knows.  The brothers, the siblings, they all know.  Like -- and they all know that Andrew has tried to defend her.  They all know the strained relationship that he had with his father.  It's just -- it's a very complicated one.  They try to get along, but it's -- it's just not gonna happen.

Q    Okay.  This -- this keeps getting better. Who -- who's Tamarin (phonetic)?

A    Tamarin is Adele's daughter.  Adele is the one that was molested by the father.  And Tamarin -- she lives there with the father and Adele and the mom.

Q    Okay.

A    And she's also been put in that same position as being molested and all of that.  And my husband was the

one trying to get her out of it.  And they told him that there's nothing that he can do about it.

Q    Who told him this?

A    This was --

Q    When you say "they," are you talking about authorities?

A    Authorities, yes.

Q    So there's records of this?

A    Yes.  Child Protective Services, there is records of the police department.

Q    Why -- not -- not being aggressive, but why did you hire me?  I don't know any of this.  I'm not attacking you.  I'm hurting.  I mean, but -- they -- when did this happen?

A    We are -- huh?

Q    When did this happen?

A    When did what happen?

Q    The police, the CPS, the Adele, Audrey's daughter or whoever's daughter.

A    Let me see.  Let me think.

Q    And he tried to intervene?

A    This was maybe a year ago.

Q    While this case was pending?

A    Yeah.

Q    So -- and now -- was there a fight with the DA

in Jefferson Davis Parish about this?

A    Was there what?

Q    A fight with the DA in Jefferson Davis Parish.

A    Yes.  He called him and talked with him.  And he was -- they were arguing back and forth of trying to get something to happen.

Q    While this case was pending?

A    Yes.  And they wouldn't -- they wouldn't allow him to come in and to do anything, even though he was a family member.

Q    Elva, I'm not trying to attack you.  You're really smart.  You're smarter than me, but I wish -- wish you would have trusted me a little bit more.  Is that why you don't trust me -- why -- why -- that's a good question.  Why wouldn't you tell me these things before -- before an hour --

MR. TENNANT:  I mean, withdraw the question, please.

Q    (By Mr. Tennant) I'm sorry, ma'am.

What -- what was wrong with me?  I know he had a conspiracy theories about me, but -- working with the State.  But what about you?  Did you feel the same way?

MS. ELMAZI:  Judge, I'm going to object to going outside the scope --

MR. TENNANT: I'm sorry. I'll withdraw the question. She's -- she's right.

THE COURT: Sustained.

MR. TENNANT: I apologize.

Q (By Mr. Tennant) Okay. Why -- why didn't you tell me this?

A That's not something we wanted to -- first, you have to be careful in sharing that information with anyone because they will use it against you. But I didn't want what my husband's father did to follow my husband. He --

Q Because --

A It's -- that's not fair to him. You can't say --

Q I'll explain during argument. I have no further questions. I see where you're going. If you have something else, please, I don't want to cut you off. Please continue.

A My husband is a good man. He's -- I respect him. I admire him. He's been through quite a bit growing up as a kid, but I admire him for going through those things and being the man that he is. He's loving. He's compassionate. He's generous. He takes really good care of me, and I take good care of him. He provides. He's very -- he's a man of integrity. Like I said, I love him. I respect him. And I do that because he earned it. He

earned respect.  He demand -- he earned it for me.  He was very open and honest with me when we met.  He didn't wait to tell me anything.  He shared that he was open with me. And I love that about him.  He's a good man.  He protects the people that he love.  And he's fair and loyal to people that he love.  And he's not a monster.

Q    Is that why he went into MMA?

A    No.  He went into MMA because that's the -- he loves sports.  He love the art.

Q    Okay.

A    Same reason why he boxed.  He loved the sport. He loved the art.  Same why I play the piano.  I love it. Same for him.

Q    Now, in regards to punishment, the jury's seated, is the jury that passed through the filter because they said they could consider if they believe from the evidence presented, apparently, that Andrew Pete was guilty beyond all -- beyond a reasonable doubt of some horrific things against a child that you met.  We respect that.  They -- they talked about that.  They did a good job.  They asked a lot of questions.  That's all you can ask for.  What are you asking from them now?

A    Wait.  I'm sorry.  Repeat that.

Q    That wasn't a good question.  What -- having found Andrew Pete guilty of some serious allegations that

apparently are true and will leave Jasmyn scarred for the rest of her life, what do you -- what do you think a jury should do about this, as far as punishment?  They have probation to 99 years on each count.

A    I feel that they should do -- do in they heart as they feel.  You guys -- like I said, I respect the decision.  You do in your heart as you feel.  That's all I can say.

Q    So...

MR. TENNANT:  Pass the witness.

THE COURT:  All right.  Thank you.

Cross-examination.

MS. ELMAZI:  You know what, Judge, I'm going to pass the witness.  I have no questions.

THE COURT:  All right.  Thank you, Ms. Pete.  You may step down.

May this witness be excused?

MR. TENNANT:  Yes, Your Honor.

MS. ELMAZI:  No objections, Judge.

MR. TENNANT:  No.

THE COURT:  Thank you, Ms. Pete.  You can remain in the courtroom.

All right.  Call your next witness, please.

MR. TENNANT:  The State calls --

MS. ELMAZI:  Defense.

MR. TENNANT: Old job. The Defense calls -- I felt like one -- the Defense calls Reverend Patterson. I got to go get him. I'm sorry.

THE COURT: Yes, sir.

(Witness enters courtroom.)

THE COURT: Come in -- Reverend Patterson; is that correct?

THE WITNESS: Pastor Patterson.

THE COURT: Yes, sir. Come on up here to the witness stand for me, if you would, please, sir. Before you have a seat, if you'd raise your right hand to be sworn.

(Witness sworn.)

THE COURT: Thank you, sir. Just go ahead and have a seat there, please.

Mr. Tennant, your witness.

**PASTOR ALAN PATTERSON,**

having been first duly sworn, testified as follows:

**DIRECT EXAMINATION**

BY MR. TENNANT:

Q Reverend Patterson, we met for the first time -- I met your dad a few times. But please state your name and relationship to Mr. Pete, for the record.

A Pastor Alan Patterson. And I'm the pastor of Andrew Pete.

Q   Okay.  And is he -- how long has he been a member of your church?

A   Several years.

Q   Okay.  And is this the same church that his wife is the minister of music at?

A   She's a director of minister of music, correct.

Q   I met -- this is the same -- a pretty big church, right?

A   Yes, sir.

Q   And you don't -- he's been found guilty of some pretty serious allegations before your time.  So I'm gonna ask you about the person that you know from the time that you met him.  You met him first when -- what year, approximately?

A   This goes back 2010, about five years.

Q   And so in the last five years -- on the State's direct his wife stated that he was --

MS. ELMAZI:  I'm going to object to comparative testimony, Judge.

THE COURT:  I'm sorry.  I couldn't --

MS. ELMAZI:  Comparative testimony, regarding the wife's testimony.

MR. TENNANT:  She's right.  Sorry.

THE COURT:  Sustained.

Q   (By Mr. Tennant) How would you describe

Andrew Pete's -- as -- as -- without trying to judge another Christian, how would you describe his walk on the spiritual path as you've observed it?

A    I take it back to my first initial encounter. And I would describe it in three stages.

Q    Yes, sir.

A    The first would be very humble spirit.  And that drew my attention because my family's been doing this for the past 45 years in ministry, so we deal with a lot of people with a lot of pride, a lot of issues.  But in Brother Pete, I discovered someone with a humble spirit.

Taking that humble spirit to the next stage, I then discovered that he was a helpful servant because he made himself available to myself and my family, whatever needed to be done at the church.  And so when I -- upon further conversations with him, privately and publicly, I found out that he had a little background in media.  So we have a media ministry because -- we're one of the largest churches -- oldest, 119 years, and we have a media program.  So with that, I found out that he had some background with that so we brought him in on our media department.

So then after figuring out that he was a helpful servant in that -- since he's been a part of that particular department, that department has grown.  And so

he's also an honorable mention of support. And he's helped my father, when my father was pastor, and he's helping me right now as our church is continuing to grow. And I'm looking forward to working with him in the future.

Q And I see the humility is mutual because -- the Reverend Al Sharpton was preaching at your church. I -- the first time I ever met him was at your dad's church -- or your church then. And that's a pretty big church.

A Yes, sir.

Q So say -- you're -- you're being modest, but this is one of the more renowned churches in -- in Houston?

A Correct.

Q And you've been up here all day with a busy ministry, correct?

A Yes, sir.

Q Now --

A In fact, I rearranged my schedule to be here today.

Q Okay. And I apologize. I don't know if you've been to law school, so I'm not trying to appear so uncouth, but I don't -- the questions I was going to ask you are pointless now. So I'm just going to get to the point.

He is accused -- the jury -- the jury

seated before you did a really great job on deliberating on the information they had and they found the verdict true, that a child's been traumatized because of his actions. They also are the people that made it through the screen of voir dire because they can consider, if they found true, the full range of punishment in this case, which is anything from probation to 99 years in prison on each count. It's not really -- I'm not going to ask you to offer an opinion. But the Andrew Pete that you know, does that -- where would he fall in this category, considering all of them require sex offender registration?

A    Let me put it this way.

Q    Yes, sir.

A    As pastor, I'm pastor over young people, children, young adults, married couples, senior citizens. The senior mothers of our church, which would range from grandmothers to widows, 70s, 80s, they refer to brother Andrew Pete as a gentle giant.

Q    Is there --

MR. TENNANT: Pass the witness.

THE COURT: Okay. Ms. Elmazi.

MS. ELMAZI: Thank you, Judge.

**CROSS-EXAMINATION**

BY MS. ELMAZI:

Q    Reverend Patterson, my name is Summer Elmazi.

I'm the Prosecutor who's handling Mr. Pete's cases. Just like the Defense counsel has asked you a series of questions, I'm going to do the same thing. If I ask you something that's unclear or it doesn't make sense, would you please stop me and ask me to clarify?

A Yes, ma'am.

Q Perfect. So, Reverend Patterson, you've known the Defendant for about five years?

A Correct.

Q And he's been a parishioner, I guess, in your church for the last five years?

A Yes, ma'am.

Q What's the name of your church? I don't think we got that.

A It's the Mount -- M-o-u-n-t, C-o-r-i-n-t-h -- Mount Corinth Church.

Q How many churchgoers do you have?

A Got about 2,000 on the roll.

Q 2,000. So on a Sunday --

A 2,000 on the roll.

Q On the roll?

A Right.

Q There could be more, I guess?

A Well, the attendance varies. That's why I'm just -- on terms of what's on the record, we have

about 2,000.

Q    Got it.  Okay.  So about 2,000 members.  On an average Sunday, how many services do you have?

A    Anywhere from two to three.

Q    And on each service how many do you think attend each service?

A    About -- when we have three services, sometimes we got attendance at around up to 700, 750 on that day.  The two services, anywhere from three -- around 300 each service.

Q    And this is in Houston?

A    Correct.

Q    Okay.  And so it sounds like you guys have a pretty -- a pretty big church?

A    It's a nice size church.

Q    And you told us that you have, I guess, a variety of parishioners, young people, I think you said married couples, children, senior citizens.  Did I get that right?

A    Yes, ma'am.

Q    And so it's a huge conglomerate mixture of folks?

A    That would be correct.

Q    You told us that the Defendant helps out with the media department?

A     Yes, ma'am.

Q     What does that mean?

A     Well, we televise.  We collect DVDs, CDs.  So we have in-house video, live streaming for the parishioners inside the sanctionary -- sanctuary on our big screens, and then we also provide DVD services as well.

Q     So when the Defendant attends services, do you get to see him on a regular basis?

A     Correct.

Q     Does that mean every week or just on Sundays?  How often do you see the Defendant?

A     Every week.

Q     Just at service?

A     During the week.

Q     Okay.  So let me ask that question again, because that wasn't a very good question.  How often during the week do you see the Defendant?

A     I may see him once or twice a week.

Q     And when would that be?

A     Sundays and sometimes during the week.

Q     When would you see him during the week, for what reason?

A     At church.

Q     Okay.  So presumably because you -- are you the head pastor?

A   That's correct.

Q   Okay.  So presumably you're delivering sermons while -- while the Defendant's there; is that right?  My question -- let me specify my question because, obviously, that wasn't a good question.  How do you personally interact with the Defendant?

A   Publicly and privately.

Q   In what respect?  How do you interact with him?

A   I talked on the phone privately with him.  We talked.  I've seen him outside of church --

Q   Do you counsel him?

A   -- in church.  Counsel, yes.

Q   Okay.  And so the Defendant has access -- or he comes into contact with a wide variety of people, just like you described, young people, children, senior citizens, married couples?

A   I'm lost at where you're going with that.

Q   Well, you just described that your parishioners consist of a wide conglomerate of folks, right?

A   Correct.

Q   So presumably there are children and young people in attendance at your church, right?

A   That would be correct.

Q   So he would come into contact with those folks?

A   Everyone would.

Q    Okay.  So in this particular case, do you know what the Defendant was convicted of?

A    I found out, yes.

Q    What has he been convicted of?

A    Aggravated assault.

Q    Not aggravated assault.

A    Okay.

Q    Aggravated sexual assault of a child, under the age of 14.

A    Okay.

Q    He's actually been convicted of three offenses.  Were you aware of that?

A    Yes.

Q    Were you aware who the victim was in this case?

A    Aware of the victim, no.

Q    Do you know that the victim was under the age of 14 when he committed these offenses and this jury convicted him yesterday?

A    I was just -- I was just made aware of that yesterday.  That's why I rearranged -- in fact, at my church, I've got a young person who was involved in a motorcycle accident, covered all on three networks.  I was supposed to meet with the family today.

Q    Well I'm sorry to hear that.

A    I rearranged that in order to be here today

because I felt this was more important.

Q    Okay.  So now that you know that the Defendant is a convicted child molester, are you going to allow him to continue to attend church services?

A    What has been convicted does not change the fact of who I know him -- as I know him.

Q    That wasn't my question, Pastor.  My question is:  As the pastor of this church, are you going to allow a convicted child molester to attend services?

A    I haven't got that far.

Q    Well, I'm asking you now.

A    I haven't thought that through.

MS. ELMAZI:  Judge, I'm going to object to nonresponsive at this time.

THE COURT:  Sustained.

Pastor Patterson, if you would, just answer as succinctly as you can.

MR. TENNANT:  Your Honor, and I piggy back -- piggy back on that objection.  Although, I was trying to avoid today.  That was argumentative.  He's answered.  He's not practicing law.  He may not know the consequences of one answer or the another.

MS. ELMAZI:  Okay.  Well, I can clarify, Judge.

Q    (By Ms. Elmazi) So, Pastor, he has been

convicted of aggravated sexual assault of a child on three indictments. You have children and young people that attend your church. As the pastor of a church that's at least 2,000 people, are you going to make them aware that a convicted child molester is one of your parishioners?

MR. TENNANT: Your Honor, that's -- that question calls for speculation.

THE COURT: I'll overrule the objection.

Q (By Ms. Elmazi) Are you going to make your parishioners aware that you have a parishioner there who is a convicted child molester?

A What I will do, as I do on everything that I do, is I pray over it. And right now I have not had time to do that.

Q So in other words, you don't know if you're going to tell your churchgoers that a parishioner, who's potentially going to be put on probation by this jury, is attending your church?

A No. What I said is I'm going to pray about the actions of where I take based upon the outcome of where we go.

Q Well, I don't understand why -- why would you do that? Don't you feel like you owe a duty to the --

MR. TENNANT: Your Honor, question's been asked and answered. Objection.

MS. ELMAZI: I'll clarify, Judge. I'll ask another question.

Q    (By Ms. Elmazi) Do you feel you owe a duty to your churchgoers to inform them that a child molester is a member of your church?  Do you feel you owe them a duty?

MR. TENNANT: Your Honor, that question -- irrelevant.  Objection, relevance, Your Honor.  He's -- this is not case in chief.

THE COURT: Okay.  I'll -- I'll overrule the objection.

Pastor, if you have an answer, answer the question.  Now let's move along.

Q    (By Ms. Elmazi) Do you have a duty to your churchgoers to notify them that a convicted child molester is a member of your church?

A    My duty is to pray over my parishioners.  And I don't do anything without prayerful consideration.

Q    So my question requires a "yes" or "no" answer, either you do have a duty or you don't have a duty.  Do you have a duty to notify your churchgoers?  "Yes" or "no"?

A    I told you what my duty is.  My duty is to pray for my --

MR. TENNANT: Asked and answered. Argumentative.

A    -- parishioners.  That's my duty.

Q    (By Ms. Elmazi) Pastor --

THE COURT:  Okay.  Move on, Ms. Elmazi, please.

MS. ELMAZI:  Okay.

Q    (By Ms. Elmazi) Are you aware of the three indictments -- the specific allegations of the three indictments that the Defendant has been accused of and convicted of?

MR. TENNANT:  Same objection; asked and answered.

THE COURT:  Overruled.

Q    (By Ms. Elmazi) Are you aware of what the three indictments are --

A    I have --

Q    -- allegations are?

A    I have been informed.

Q    Okay.  Tell this jury what the three allegations are.

A    We just went over this, ma'am.  I told you I've been informed to a degree.  And I'm learning -- I just found out yesterday.  I've got all my members that I have to be taking care of.

Q    I understand that.

A    I got word -- I got word yesterday and I'm here

to show my support and my concern.

Q   Pastor, I understand you're very busy.  We get that.  I think everybody -- this jury is very busy.  We get that.  But the Defendant's life is at stake here, so if you will just please answer my questions, I'm almost done.  I promise.

Are you aware of the specific allegations that the Defendant was indicted for, the specific acts that he committed against Jasmyn Witherspoon?  "Yes" or "no"?

A   If I'm -- if -- can I clarify what you're saying?

Q   Absolutely, please.

A   If I can clarify it -- and correct me if I'm wrong -- you stated the three allegations.  Are you aware of what an allegation is?

Q   Pastor, I get to ask the questions.  I'm the lawyer here.  So if you don't understand the question, you ask me to clarify.  I know what the allegations are.  I'm asking if you do.

A   I'm aware of the allegation.

Q   So you were aware that the Defendant is accused of having digitally penetrated with his finger into Jasmyn Witherspoon's vagina?  You're aware of that allegation?

A   Allegation?

Q    Yes.

A    Yes.

Q    You were aware of that.  Are you aware that the Defendant is convicted of and was accused of putting his mouth inside Jasmyn's Witherspoon -- putting his penis inside of Jasmyn's Witherspoon's mouth?  Are you aware of that?

A    Allegations.

Q    He's been convicted of it, so it's no longer an allegation.  Are you aware of it or not?  "Yes" or "no"?

MR. TENNANT:  Your Honor, this is vague. Because she's trying to get him to use allegation and a conviction --

MS. ELMAZI:  I -- I -- let me clarify.

MR. TENNANT:  If he doesn't know, he doesn't know.

MS. ELMAZI:  I'll clarify, Judge.  No problem.  And I'm almost done.

Q    (By Ms. Elmazi) So let's make sure -- the Defendant was convicted of putting his penis inside of Jasmyn Witherspoon's mouth.  Are you aware that he was convicted of that offense?

A    Ma'am, this is my first day here.  I am here as support and spiritual support for my member.  I've not been here in court, so all the details that you're asking

me, I cannot give you clarity on that.

Q    So the answer is "no," you were not aware?

A    I did not say I'm not aware.  I'm saying you're asking specific details.  I'm here as a support system.

Q    And, Pastor, my question was:  Were you aware that that is what he's been convicted of?  "Yes" or "no"?

A    Yes.

Q    Were you aware that the Defendant was convicted by this jury of putting his penis inside her vagina?

MR. TENNANT:  Your Honor, we're looping back through.  Asked and answered.

THE COURT:  Overruled.

Q    (By Ms. Elmazi) "Yes" or "no"?

A    Yes.

Q    And still you have to pray about whether or not you'll tell your churchgoers that this convicted child molester will be allowed to attend church?

MR. TENNANT:  In order for her to quote it, it'd have to be asked and answered.  Objection.

MS. ELMAZI:  I'll withdraw the question.

I'll pass.

THE COURT:  All right.  Any further questions, Mr. Tennant?

**REDIRECT EXAMINATION**

BY MR. TENNANT:

Q    The allegations -- well, the conviction that the jury rendered yesterday, it was done after much deliberation on the evidence they had.  Do you think -- and the crime happened much earlier than 2010.  Do you think Andrew Pete -- what -- the person that you've met -- this is gonna open some doors -- likelihood that he would be a successful probationer and comply with the very rigorous rules under the condition that the Court can terminate his probation at any time?

A    Yeah.

Q    Do you think he can comply with those rules?

A    Definitely, yes.

Q    Do you think he could successfully register as a sex offender for the rest of his life?

A    Yes.

Q    And do you think he could still find a way to continue his spiritual growth and become and continue to strive to build a better man while also showing regret, remorse and compassion for any -- any harm caused to the -- the people that the jury -- the jury, after careful deliberation, have found him guilty of -- of the person -- now, I'm doing it -- the person from Dallas that the jury has found him to be guilty of based on the accusation?  Do you think he showed -- he would -- he regrets that?

A    I believe that.

Q    Now, an allegation -- you don't know, but you said that what -- yes, you did know that this was pending and you changed your schedule to be here, despite the media aspect of your church right now.

A    Correct.

Q    So you lose -- I mean, ad hours aren't free. And the -- I understand that -- you know, you're losing membership and -- and the things that go along with that right now, but you also have downplayed the size of your church so many times that I see the modesty is being taught well.  So do you think that this was more important than that?

A    Absolutely.  That's why I'm here.

MR. TENNANT:  Thank you.  Pass the witness.

MS. ELMAZI:  Nothing further, Judge.

THE COURT:  All right.  Thank you, Pastor. You can stand down.

THE WITNESS:  Thank you.

THE COURT:  May this witness be excused?

MR. TENNANT:  Yes, Your Honor.

MS. ELMAZI:  No objection.

MR. TENNANT:  Waive.

THE COURT:  Thank you, Pastor, for being here.  You're free to go.

THE WITNESS: Thank you, sir.

THE COURT: Thank you.

MR. TENNANT: Real brief -- two-question witness, Your Honor.

THE COURT: Yes.

MR. TENNANT: Audrey Robinson.

(Witness enters courtroom.)

THE COURT: Okay. Come in, Ms. Robinson. Again, if you would, please, ma'am, just down here to the witness stand for me.

Let the record reflect this witness has been previously sworn and has previously testified. Go ahead and have a seat there for me, Ms. Robinson.

Okay. Mr. Tennant, your witness.

MR. TENNANT: Yes.

**AUDREY MARIE ROBINSON,**

having been previously duly sworn, further testified as follows:

**DIRECT EXAMINATION**

BY MR. TENNANT:

Q Just a couple of questions, Audrey. Do you -- first of all, do you see -- when you met Jasmyn, how long had you known Mr. Pete?

A A couple of months first -- the first time I met her.

Q   And what sorts of athletic events did you do at that time?

A   At that time I was playing volleyball.  I've played basketball.  Did a little softball.

Q   Now, describe your impression of her personality at the sleepover.

A   At the sleepover?

Q   Yeah.  Before -- before Andrew told her about the marriage, describe her personality --

A   She -- she we was having fun.

Q   -- based on your -- your personal knowledge?

A   My personal knowledge --

Q   Yes.

A   -- at the sleepover, we had fun.  We talked about, you know, what girls talk about.

Q   Was she shy?

A   Not at the sleepover, no.  Because by then we had got to, like, break the ice a little bit.

Q   Okay.  You haven't seen her here.  How would you describe her based on the last time you saw her?

A   Explain to me how --

Q   Okay.  I -- I -- I'm sorry.  Was she an outgoing person or, like, real sheltered and timid?

A   My personal opinion, when I first met her, I could tell that she had been sheltered versus me and how I

was brought up.

Q    Well, you told me -- everybody is sheltered versus you, Audrey, but anyway.

A    But as getting to know --

Q    What do you mean by that?

A    I mean, like, I could tell that she hadn't been through, so to speak, some things that I went through to make me become -- be who I was, if that makes any sense.

Q    Yes, it does.  Because -- now it's time -- what Elva knows -- what is it that you've been through that makes you so extroverted?

MS. ELMAZI:  I'm going to object to relevance, Judge.  This has nothing to do with punishment.

THE COURT:  Sustained.

A    It's -- it's fine.  I mean...

MS. ELMAZI:  I'm going to -- I've objected.

THE COURT:  I sustained the objection.

Q    (By Mr. Tennant) Okay.  So when you said that the -- something -- is there anything about Jasmyn that you feel we should -- I mean, no, I'm sorry.  Andrew has been accused of molesting Jasmyn and -- and the jury has deliberated and found him guilty of it.

A    Yes.

Q    Is there anything -- is there anything you would want the jury to know as they consider -- because they --

they have a big job ahead of them -- as they consider the full range of punishment, based on the fact that they feel, from the evidence they have, that this is true?  Is there anything you want them to know?  They -- they worked hard yesterday.

A    Yes, I agree.  They worked hard.

Q    Yeah.  So -- how do you feel about the verdict, first of all?

A    I respect the verdict because of the evidence that they were allowed to, you know, have.  I mean, there was only -- that's all they have is just the evidence that was provided -- or that was allowed into evidence.  But hearing --

Q    When you met -- this is a good one.  When you met Jasmyn, did she have a camcorder?

A    Yes.  We actually -- she actually took a couple of videos of us.  We -- she recorded some, like -- we were -- at the sleepover, for example, she talked about how she liked music and stuff.  So we played music and she recorded us dancing and singing.  And we was just having fun.  And another video I remember she recorded was -- we went crabbing.  And there's a video of us -- all -- well, me, her and a member from church -- a lot of youth from church went crabbing.

Q    Is Mr. Pete in that video?

A   Of course.  He is in the video.  Livi -- well, Elva is in the video, myself.  Jasmyn is actually in the video and some of the youth from the church is in the video.  We were just having fun.

Q   And that's a video of what year 2009, 2010?

A   2009, I believe it was.  It had to be 2009 because we --

Q   Have you seen the video recently?

A   Yes, I have seen the video.  It actually brought back fun memories because I remember it.

Q   Do you see any video cameras in this courtroom, meaning any AV media in this courtroom?

A   No.

MR. TENNANT:  All right.  Pass the witness.

MS. ELMAZI:  I don't have any questions, Judge.

THE COURT:  All right.  Thank you, Ms. Robinson.  You can step down.

May this witness be excused?

MS. ELMAZI:  No objections, Judge.

MR. TENNANT:  No objection.

THE COURT:  Thank you, Ms. Robinson.  You're free to go or free to stay in the courtroom.

MR. TENNANT:  Final witness, Your Honor, Andrew Pete.

THE COURT: Okay. Mr. Pete, come on up here to the witness stand.

THE DEFENDANT: (Complies.)

MS. PATEL: Judge?

MR. TENNANT: Judge, I forgot that --

THE COURT: Okay. Just -- you can testify from right here.

MR. TENNANT: Can we instruct the jury to disregard that, I guess?

MS. ELMAZI: Can we ask that the jury please step out for a few minutes?

THE COURT: Yes.

THE BAILIFF: All rise.

(Jury exits courtroom; 2:37 p.m.)

THE COURT: Go ahead and put them in the jury room.

THE BAILIFF: Okay.

THE COURT: You may be seated. Let me see counsel back here.

MS. ELMAZI: In the back, back.

THE COURT: Yeah, in the back.

(Court in recess; 2:37 - 3:35 p.m.)

(Open court, Defendant present, no jury.)

THE COURT: Back on the record in Cause Number F12-33559, F12-33560, F12-33561, all styled the

State of Texas versus Andrew Pete. Let the record reflect this hearing is being held outside the presence of the jury.

And, Mr. Tennant, I believe you had a motion to make?

MR. TENNANT: Yes. Your Honor, at this time, we have no choice but to move for a mistrial under the Fourteenth Amendment, the Eighth Amendment and, of course, 397 US 337, Illinois v Allen case, in which the Supreme Court said that it's -- the sight of shackles -- when other remedies are addressed -- must have a significant effect on the jury's feelings about the Defendant and to insight that it is not -- inheritable [sic] prejudicial practice would be an abuse of discretion. It should be permitted only where justified by the specific interest of each case that's favorable. However, in that case, the perception -- the instruction would be to take the jury out prior to allowing them to see. So even in cases such as Haliber (phonetic), where the defendant was a Hannibal Lecter type, the remedy was to take the jury out. Because even this guy, with multiple bodies buried, his rights -- his case was reversed, remanded, and his rights were deprived under the Fourteenth Amendment to -- right to a fair trial by allowing the Judge to see the -- to see him in trial.

And in concurrence, the Roberts court, the more recent -- in 2010 case, which is under Judge Roberts 19 -- June 22nd, 19 -- I mean, 2010, in the United States v Cherry stated in his majority ruling that abuse of discretion would be found because you can't rely on Lemmon, which controls physical restraint, and to look at a juror in chains -- for a jury to see Mr. Pete in chains -- guilt/innocence or punishment -- must have an effect on his perception of Mr. Pete, regardless of whether the jurors is aware of that perception.

I don't want to come back up here, but at this point, unless -- we -- we've been talking in the back, but I think that we have -- we have to move for a mistrial.

THE COURT: Okay. All right. Thank you.

State wish to be heard on the Defendant's motion for mistrial?

MS. ELMAZI: Yes, Judge. First of all, the Defendant has actually -- was not convicted until yesterday afternoon. I think he was convicted around 4:15 in the afternoon. The Defendant -- up until yesterday afternoon -- was walking about -- out and about for the past weeks since last Wednesday when we began proceedings. The jurors have seen him walking out and about. They know that he's been convicted. In fact, this

is the same jury before us who deliberated in guilt/innocence, which will deliberate in punishment. They are the ones that issued that guilty verdict in each -- in each indictment. Therefore, I don't believe that it is harmful. I don't believe that it's prejudicial. They know that the full range of punishment is probation up to 99 years or life. And I think from a 403 standpoint, if we're talking about it being prejudicial, I don't believe that it is. I, actually, don't think that the jury even understood what was going on because we immediately removed the jury. And so I don't believe that -- that this is in any way harming the Defendant and -- at best, you know, the -- the Court can instruct the jury, within the Charge itself, regarding this -- this particular issue. But I believe that we have cured it. And I don't believe that the Defense -- the Defendant has been prejudiced in any way.

THE COURT: All right.

MR. TENNANT: And to -- to rebut that -- to go back to the abuse of discretion standard, that actually supports the position under the United States Supreme Court ruling in Tires v Fender [sic], which is a more recent case, 1983, relying on Allen, in reasoning that if the trial court -- it's not an abuse of discretion for the trial court to require a dangerous defendant to appear in

leg irons. So if there's some action in the transcript, or his past, based on the conviction yesterday, light most favorable to the prosecution -- let's say based on the conviction yesterday, he's deemed that he is inherently dangerous, too, and leg restraints are well within the purview of the court -- as it's well aware -- to use. However, the Supreme Court said, in those cases, it is still a fundamental liberty, secured by the Fourteenth Amendment, that -- to hold and require a party to appear in shackles may deprive him of due process unless restraints are necessary. Even if they're necessary, it is his right to appear in front of the jury without specific restraints because -- and the reasoning by the lead of -- not by the Defendant, not -- but in the reasoning -- the likelihood of prejudice inheriting and exhibiting the subject of a hearing to a jury while bound in physical restraints is simply too great to be cognizance without at least some remedial action. In this case, the remedial action would have been to tell the jury to leave. He can waddle up to the box; jury comes back in, and there's no abuse of discretion.

We made a mistake. It's unfortunate. But to allow this to continue beyond this mistake is -- is a -- it's -- the balancing test is there. The case law is there. I have an e-mail of all the cases, if the Judge

wants to review them. And we -- the prejudice -- the rights of the Fourteenth Amendment -- ironically, we talked Sixth Amendment earlier, in the 38.37, but the rights of the Fourteenth Amendment are inherent right to a fair trial.

Since the Magna Carta eliminated me -- saving mistrials -- we've had our right to face our accuser and have the accuser accuse us in open court. Our Constitution, built on the Magna Carta, by adding the Fourteenth Amendment, which controls and governs the rights of a trial. The only difference between us and North Korea right now are the rules that we have in place. And in the Republic of Texas all places -- a state that could exist as -- as a nation and still be one of the ten -- top ten gross national product-producing countries on the planet --

THE COURT: I'm ready to make a ruling here.

MR. TENNANT: I know, Judge, but I'm just trying to stress that this really would be an abuse of discretion with all deference to -- to not grant a mistrial, but I'm prepared to proceed, if we don't.

THE COURT: Okay. I am -- I'm going to take the motion for mistrial under advisement. Not rule on it at this time. We're going to proceed with the trial

and --

MR. TENNANT: Fair enough, Judge.

THE COURT: -- let me think about it.

MR. TENNANT: Thanks, Judge.

THE COURT: Okay. All right.

MS. ELMAZI: Yes, Your Honor.

THE COURT: And I need to do a little research on my own --

MR. TENNANT: Yes, sir. Yes, sir, Judge.

THE COURT: -- before granting a mistrial. So we're ready, I think, now for the jury.

(Jury enters courtroom; 3:44 p.m.)

THE COURT: Thank you, ladies and gentlemen. Be seated, please.

Mr. Tennant, your witness.

**ANDREW PETE,**

having been previously duly sworn, testified as follows:

**DIRECT EXAMINATION**

BY MR. TENNANT:

Q    Mr. Pete --

A    Yes, sir.

Q    -- been awhile. But first question. Same thing I've been asking everybody. You've been in the room. What do you think about the verdict reached yesterday by this jury?

A    I fully understand.  Y'all have a job to do. I -- I -- it's not formality speaking.  I truly respect the time that y'all have done to deliberate and put in. For what was shown to you, I -- I do.  I really understand -- I understand the decision, how y'all came to it.  Do I agree with it?  No.  I am the only person that been there from the beginning to the end of everything.

Q    Andrew, one of the things we talked about.  I'm going -- try and answer the question asked.  Although, I'm going to give you a lot of latitude to talk.

A    Okay.

Q    So with that being said, why didn't you tell me about something that apparently everybody knew except me. And that's -- and will you please now tell me what I did -- what I'm finding out from one of the young ladies on the stand earlier for the State.

A    I didn't tell him about our family history because those were demons that ate at me when I was younger.  And I shared that past pain with people before. And that past pain I shared with those people, they have used those exact things to come back and destroy me.  I've learned a lot from sharing my past family history with some people because some of the same --

Q    By some people -- I'm sorry -- just...

A    Rotonia Witherspoon, Patrice Riley, Cornisha

Riley, Jasmyn Witherspoon and her first cousin, which is actually here, Shanelle Alberoni (phonetic), which is now Shanelle Thomas.

Q   Okay.  Now, turning to -- so, again, we talked about this at length.  And the IRS analogy you said yesterday might -- you might need to turn and explain to the jury where you're coming from, as far as your views on their ruling, because it was a fair ruling, I think.  Can you explain what you told me?

A   It's -- it's a fair ruling considered what was given to you.  I'll give you two examples.  And --

Q   Not evidence, examples.

A   Examples.  I -- this is very hard for me to even talk to you-all, because I understand the picture that's been painted in your head of me.  And as I sat there, took myself out of the picture, I heard the same person that Summer described, based on what you saw.  But if I show you a bowl of apples and say what do you do see and all you see is apples, I can't be wrong if you say a bowl of apples until you cut the apple open and acknowledge magnets [sic], worms and a lot of other host of things.

Q   Okay.  I agree.  But try to answer -- we'll get to a lot -- you'll do a lot better if you answered it -- after I finish the question, turn and look at me and --

A   I'm sorry.  Go ahead.

Q    No problem.  No problem.

A    This is a first for me, too.  I've never been in this position, so this is a first for me, too.

Q    So when you said earlier that you respect the jury's ruling, you -- you gave me an analogy of taxes. What did you mean by that?  We all pay taxes.

A    Nah, I gave you an analysis of a toxic chemical. You gave me the analogy of taxes.

Q    Okay.  But at any rate, let's keep going.  So having been found guilty, no criminal history, why should the jury -- because they don't have to.  They've agreed to consider the full range.  Do you have any regrets about this case --

A    Yeah, I do.

Q    -- other than being convicted?

A    I do.  I have a big regret.  One of the biggest regret is that I failed y'all because I -- I selected a juror of my peers, and I failed y'all.  Because I should have got my butt up here and testified.  Because there are 15 years between -- 99 now, if not more, that we tried to sum up in five days.  And I failed y'all for not letting y'all hear my side of the story.  I failed y'all by not letting y'all -- I allowed y'all to be confused about a lot.  And that's my fault.  But at 44 years old, no prior convictions, no trouble, not nothing as little as a

speeding ticket. I don't drink. I don't smoke.

Q Andrew --

A I'm sorry.

MR. TENNANT: Object, narrative form of the question for the State. Okay.

Q (By Mr. Tennant) She'll get a chance to ask you all of that in a second, please. Trust me.

But how old are you -- just to be clear, about how old were you -- I know it's a childhood memory. How old were you when you saw this and what did you -- what did you see that your brother was talking about?

A Okay. We were, roughly, 11 or 12 years old. My dad was a mechanic. He owned his own shop. My mom did a lot of missionary work for the church, so a lot of times she would be on missionary work. Saturday mornings my dad will send us off to the shop, you know, to do some work. Well, once we get there, he will always leave and go back home. I knew what was going on, so I always --

Q How -- how did -- how did you know what was going on?

A Because I seen it -- I seen it more than once. I seen it --

Q What is "it"? I'm not being hostile, just asking.

A Our bedroom, which is, ironically, built

something like the house that Cornisha Riley was explaining -- from one bedroom, you can look out the door and you can see the dining room and the couch. And I remember my sister coming home -- the very first time I witnessed was -- my sister was coming home from a track meet. I was sleeping in the bed. Well, they thought I was sleeping. And I saw my dad reach down in my sister's shorts, and then started having sex with her there on the couch.

Q     That sounds a lot -- Andrew, are you describing -- and this is -- I thought about this one, so -- are you describing yourself with one of the victims here, or are you describing your dad?

A     No, I'm describing what I saw as a child with my dad.

Q     Keep going.

A     That -- that was -- that was the first thing. It happens a lot of times, even -- you know, sending us outside to cut grass or weed eat around the house.

Q     What about the time -- let's go with a time, not the time. Because I need to know what happened -- the fight is what I'm trying to get to.

A     Well, it happened more than once. The first time me and my dad actually got into a physical fight --

Q     How old were you?

A   I had to be 11, 12.  I wasn't a teenager, I know that.

Q   And how big -- relative to your size now and your brother, how big was your dad?

A   My -- like --

Q   Like you?

A   Yeah, but I was --

Q   And how did -- how did that fight go?

A   Not good.

Q   Okay.  And after -- why didn't your brother -- he saw all of this.

A   My -- okay.

Q   Yeah.

A   Okay.  I didn't want to testify because I didn't want to bring up all this hurt.

Q   Is that why you didn't tell me?

A   Exactly.  My brother suffered from seizures really bad.

Q   And what does that have to do with today, Andrew?

A   Well, they favored him.  And my brother looked up to my dad as Superman.  He couldn't do no wrong.  So when I told my brother the first time, he didn't want to hear it.  He knew it.  He just didn't want to hear it.

Why I didn't tell you?  Because I don't

like talking about this stuff.  I don't want to talk about this.  This is what got me here, because I shared it with those people right there (indicating).  And the moment they could use it to try to hurt me, that's exactly what they did.  So I got to be careful how I speak.  I'm a big guy.  I talk passionate, come off as if I'm being aggressive or angry; and it's none of that.  I told her 15 years and five days --

Q   Andrew, if it helps.  I'm not scared of you.  That's -- I'm trying to lighten up a little bit.  I need you -- I need you to tell me why that -- that -- because the way we've talked around it -- Andrew, I was wondering, have you been molested yourself?

A   No -- no, I have not.  My dad never molested me personally.  I have never been molested.

Q   So you were -- but you were singled out?

A   Yeah.  Unfortunately, my -- my dad -- my dad was a major Deacon in the church.  My dad was also a hidden alcoholic.  My dad also smoked weed.  I didn't tell him about it is because I see what it does to my brother, number one.  I know what it does to me.  I felt like it was irrelevant to this.  But since we on it, I'm going to talk about it.

Q   And --

A   That's what kept me from --

Q   Andrew, you understand it wasn't your call for you to make, right?  But keep going, please.  Do you understand that?

A   Understand what?

Q   That that wasn't a call for you to make.

A   No, it wasn't.

Q   Okay.

A   I -- I stayed away from that because, number one, I didn't want no one to look and say, he's trying to play -- all due respect, but this seem like a bunch of emotions have been played on this whole week.  Let me tell the most horrific, terrifying story I can make up to make it seem believable to play on emotions.

Q   Why --

A   I didn't want -- I didn't want no one to feel as if my story of what happened when I was growing up is me trying to play on anybody's emotions.  But the truth to the matter is, those things was my daddy.  That wasn't me. My daddy smoked and -- smoked weed and was a full-blown alcoholic.

Q   And that has to do --

A   I have never touched weed --

Q   Andrew, I'm not being difficult, but that has to do with the case in front of us and the decision the jury has to make how?  And this -- this is not rehearsed.  I

just need -- I need you to stay on point.

A   I don't -- this is my first time sitting in a position like this.  I never had to testify -- I never been, you know, criminally charged with, you know, a felony ever.

Q   Now --

A   So --

Q   Go ahead.  I'm sorry.

A   So all -- all of this is new to me, too, but it's hard when someone pretty much made up their mind. And right now, all I'm asking is --

Q   Now, here's --

A   I don't know what to say, because I --

Q   You know my background.  So here's a question that the jury's going to have and Summer's going to bring up, I'm sure.  If you don't agree with the ruling, how could you possibly complete a probation?  It's hard.  How could you do that?

A   Well, I don't -- I don't agree because I know the full truth.

Q   But do you accept the ruling, Andrew?  And it's important.

A   I understand the ruling.

Q   Do you feel the jury deliberated enough to reach their decision?

A    I understand what y'all had to do.  I understand the stories that y'all heard, but I am the man that all consequences fall on.  And I am the man that know the full truth, the whole truth and -- for an example --

Q    Andrew, I'm -- I know you're going to be upset, but you got to listen, please.  You're not answering the question.  I feel like I'm badgering you.  But, listen, how can you complete a probation if you don't agree with the ruling?

A    I've been a law-abiding citizen my whole life.  I mean, I'm 44.  This is the only thing that's been thrown at me.  So it's not like -- you know, I mean, I don't even have a speeding ticket.

Q    Sex offender registration is hard.  Every -- you understand that?

A    I'm -- I'm aware of it.  I don't understand it because I never had to do it.

Q    You can comply with that?

A    Yeah, whatever -- whatever it is I have to do, I can apply [sic] with the law.

Q    And I need to find out that -- to learn that you are not a sexual abused victim, you still need counseling.  You understand that, right?

A    I need counseling?

Q    Yes.

A    Yeah.  I fully agree that I -- I need counseling for -- not for the things I've done, but --

Q    So what do you really -- you really should -- yeah, I agree.  But what do you really think about the -- the one victim in this case?  Because there's only one, and that's Jasmyn.  We understand that.  What -- what's your thoughts here?  Do you regret -- she's been through something to be here.  Would you agree with me on that?

A    I agree.

Q    Explain to me.  You're the one that told me.  Now what does that mean?

A    What does --

Q    When you say she's been through something to be here, what -- what did you mean when you said that?

A    Some -- some of these stories that y'all heard, when I tell you they are a 110-percent absolute no truth to it, there is none.  This story about the -- I think they said it was in 2005 -- some incident where she went and told someone and someone told me --

Q    They've reviewed -- you got to trust me on this.  I might know what I'm doing.  They reviewed the record.  If they want to know any more, they can find my number and I'll show them everything.  You don't talk about the ruling that they made.  They found a true verdict true.  If you respect it, let's keep moving.

A    I understand that, but I also -- this is going to be my first and probably last time speaking to y'all, so I just want to make sure that y'all know my truth.  So if I'm allowed that, I don't mind telling them that.

But that -- that was a story that I'm sitting here listening to -- that was new to me.  Britney, the girl Jasmyn's talking about, I never had a problem with Britney.  And I -- to be honest with you, when I -- before yesterday, I was trying to find Britney, because I wanted her to get up here.  Because my thing was, this is what was told to Britney and I would love for Britney to take the stand to say was this told to her.

Q    Andrew, I agree.  There's a lot of stuff not in evidence.  Can you follow a probation if the jury decided that was an appropriate punishment --

A    Yes.

Q    -- after understanding that --

A    Yes, yes, yes.

Q    How -- why -- how do you --

A    Because I am law-abiding citizen.  I don't -- I don't break the law.  I just -- I'm not saying -- I just don't.  I mean, my -- besides -- besides the false allegations that have been brought up and made me get arrested on someone walking in, saying something that I done -- I heard a detective -- which I've been blind in

America.  I heard a detective --

Q    Now wait a minute.  That wasn't clear.  You might want to clarify that.  What were you talking about just then?  I -- I was lost.

A    Okay.  I'm fixing to tell you.

Q    Okay.

A    I was blind when I heard that a detective was asked, what made you feel as if the charges was probable, and I heard a detective say, because she sound believable. And upon that, you're going to take a man that don't have any -- any -- any kind of criminal record and put him --

Q    Except for --

A    -- on these type of charges.

Q    Except for the facts alleged in this case, right?

A    Yeah, that's the only thing I'm talking about.

Q    Okay.  Now, with that being said -- now you can -- I'm gonna step back and let you say what you want to say, but we need to talk about a couple of other things.  Physically -- from a physical health standpoint, how are you now?  What do -- what's the last year, two years, three years, been like physically, not emotionally?

A    Rough.

Q    Explain in detail, please.

A    I -- I'm extremely active.  I don't -- like I

say, I don't --

Q    Okay.  If you can answer it medically.  I know the HIPAA.  We talked about this.  I'm sorry, Andrew, but I'm trying to help you.

A    I'm very active, from basketball to mixed martial arts to boxing to bowling to anything.  A couple of years back, I caught a thrust kick in my hip that broke a vessel.  It stopped the --

Q    Andrew, excuse me.

MR. TENNANT:  Objection to vagueness.

Q    (By Mr. Tennant) You do understand that you're not physically -- that's part of -- you're not physically active any more.  You understand that, right?

A    Yeah.

Q    Is that true?

A    Yeah.

Q    That part's over forever, right?

A    Yeah.

Q    Now, explain the -- your pride -- explain to the jury, medically, where you are now, not where you were ten years ago.

A    Physically, I had to have a full hip -- left hip replacement, caused a lot of complications.  I am, right now, struggling with four blood clots.  All of them

enlarged in one of the most -- two enlarged in my arm, straight aimed for my heart; two in my leg, aimed for the straight heart. I clogged up on warfarin, which is a very strong blood thinner. When I clogged up on that, they -- now I have to take injections every day, twice a day, in my stomach, Lovenox. Three bulging disk in my back. And I -- respectfully, to my attorney, this is not something I even wanted to talk to y'all about, because I don't want to look like I'm trying to bring a pity party because my health is not what this is about.

Q Okay. Well, what about the -- I understand that, Andrew. But what else is going on? The bronchitis last year that you couldn't take antibiotics for because of blood clots, how did that turn out for you?

A Not good. I don't know what happened. But the last two years, I think I've been in the hospital four times with a severe case of bronchitis. I didn't know bronchitis was so serious. I didn't know it could kill you. But the problem is that the medicine they have to give you to cure you, I can't take it --

Q You can't take it?

A -- because the blood clot. So every time I get it, I got to get hospitalized for at least six, seven days, tops. And in the last three years -- these trips to Dallas is normally three and a half hours each. For me

and my wife to take, it's roughly about six hours because we have to pull over every 30, 40 minutes because of the blood clot.  And I promise you, we have taken over 30 to 35 trips back and forth to Dallas.

Q    And if you're placed on probation, there's at least -- in the beginning, more than once -- at least one, seven-hour trip each way once a month for a considerable amount of time, up to ten years, I'm guessing by the charge.  And you're willing -- you -- that's -- other than that -- that or 5 to 99 years in prison is what you're facing.  With your accuser sitting here, do you have anything you wish to say -- and it's -- it's okay -- to anyone directly, as far as the victims --

MS. ELMAZI:  I'm going to object to the Defendant --

A    No.

MS. ELMAZI:  -- in any way, shape or form directing his comments to the victim or any witness that's testified in this case.

THE COURT:  Sustained.

MR. TENNANT:  Fair enough.

A    I agree.

MR. TENNANT:  Permission to approach, Your Honor?

THE COURT:  Yes, sir.

(Bench conference; off the record.)

Q    (By Mr. Tennant) There was a -- when did you tell -- so with things clicking in place now, why were you so -- why was Jasmyn always around?

A    Around what?

Q    You.  Why was Jasmyn always around you?

A    Jasmyn was always around us.

Q    Right.

A    It wasn't just -- it wasn't just me.

Q    Does this have -- I'm asking you because of your sister.  I mean, you've got to talk to us, Andrew.  Your brother, your sister, your dad.  I'm trying to reconcile these -- all this with what you're being charged with.  Do you think that makes it more or less likely that you did this?

A    No, because I know what -- I know I didn't do it, so your question is kind of --

Q    No, I -- what I was asking you is, could you -- could you do this?

A    No.  Okay.  With my sister, yes, I -- I truly was trying to be a protector.  That just -- and it's not just who I was then.  It's who I am now.  The majority of the people that be around me was -- my first thought of process as a man is always defend and protect.  That's just -- that's just it.  And even the ones that has

accused me of these things will probably say, yeah, that's his thought process.

What bothers me the most is that what you don't know, is that my niece during this trial -- in the last three years, my 12-year-old niece, actually, was raped, with a -- with a DA that I argued with, Michael Cassidy out of Jeff Davis Parish in Jennings, Louisiana. Me and him argued, back and forth, for over a year, dealing with my niece. And I told him this was gonna happen. And when it happened to her, they caught the guy in the act and he have HIV. He's HIV positive. They caught him in the act. And right now he's serving prison for the rest of his life right now.

And the reason why I could not get my niece to come stay with me -- two reasons: One was, I wasn't -- I wasn't a parent. I'm just the uncle. And there was rules that my sister have to sign over guardianship. And even with this, she still wasn't willing. And, two, which really bothered me, I couldn't get my niece to come stay with me because I had pending charges like this. And if these charges wouldn't have been pending, I could have got my niece out of the house before this happened. And there's so much y'all don't know. It's so much that just was not given to y'all. It's --

Q And with that being said, you could do a

probation, knowing that you're on probation and a registered sex offender for the rest of your life?

A    I -- I can -- now, I might get an objection from this, but this is my first time here so I might say something kind of crazy or idiotic.  And I apologize.

Q    Careful.

A    But, yeah, I could do a probation.  Because if y'all go back there right now and say we'll overturn our verdict and say not guilty --

Q    Can't do that.

A    -- I can live life freely and with no problem like I've always have.

Q    I'm not trying to be difficult, Andrew.  I know you're a proud man.  I also know you're very scared right now.  It would be a good time to take that shield down.  You're hurting.  You're -- physically, you're not the gentle giant no more.  You're just -- be patient.  It's okay to be vulnerable in front of your wife.  Please talk to me.  Talk to the jury.  If there's something I left out -- because we probably have.  There's a lot going on today, a lot of information to absorb.  If there's anything I missed that you need to say to me or to the jury regarding only your ability to accept or reject the finding of the jury, please tell them.

A    Okay.  I'm going to start off with Cornisha --

Q No. I think that's a mistake to be made. Start with Jasmyn, at least. She's the one on trial, not Cornisha, please.

A Okay. With Jasmyn, I -- me and her mother, first time we moved in, it was in 2004. To be exact, it was June of 2004. We moved in because my nephew came and stayed that exact same weekend -- I mean, that same summer. Me and Tonia, we just -- Tonia's a thrower. When she get upset or mad, she throw things. Whether it's off the wall, whether it's a glass, whether it's a plate on the table, she's going to throw it. And, you know, like I say, I failed y'all. Because there are e-mails from Tonia --

MS. ELMAZI: I'm going to object --

MR. TENNANT: Okay.

MS. ELMAZI: -- to hearsay at this time, Judge.

THE COURT: Sustained.

Q (By Mr. Tennant) That's what I'm trying to tell you, you can't --

A Okay.

Q The evidence that they don't know, they'll never know.

A All right. And that's why I said, I failed y'all, because I should have took stand. I should have

forced some of this stuff to be in evidence. So it's hard to defend yourself when you're so limited to exposing the truth.

Q How many times did you see Jasmyn in Louisiana without her -- she was in journal- -- how many times did you see her in Louisiana without a camcorder, walking around?

A She --

Q How many videos did we watch?

A She -- she videoed pretty often.

Q The crabbing trip?

A Video. Christmas trip.

Q Blue Bayou?

A Blue Bayou, video.

Q Christmas?

A Christmas video. And not by me, not by me.

Q Who's narrating?

A Jasmyn -- Jasmyn -- Jasmyn, except for one. The one for Christmas, her mother is narrating; all the rest is Jasmyn.

Q That is a -- journalism school, LSU, right?

A Right. Now, okay.

Q One -- last -- last question -- I mean, after you answer this question, I'll try to think of something else, but I really need you to talk to the State in a

minute.

A    Okay.  Jasmyn decided to go to LSU -- a LSU program during the summer of 2008.  And after the program, she wanted to come and stay at the house for two weeks, which her mama didn't have a problem with it.  I didn't have a problem with it.  And -- so when Jasmyn was done at LSU -- I think it was a week or a two-week program.  I'm not -- I'm not too sure -- but I went and got her from LSU.  Her mama knew about this, because I met her mother and her cousin in Lafayette, Louisiana to buy the rest of the stuff that she -- that was needed for her to go on -- on this journalism thing.  When LSU was over, I went and got her.  She came and stayed two weeks and that's when she met Audrey and Quiana.

I was a truck driver, but I want -- I want to clear something up about being a truck driver.  I was only over [sic] the road for six months.  Everything else, I was local.  The whole time I dated Tonia, I was local. So the sleeping cab, I never drove a sleeping cab while I was with Tonia.  I was a local driver.  I went home every day --

Q    Andrew, I know it's frustrating.  This is not guilt/innocence.  That wasn't admitted.

A    Okay.

Q    You need to stop, please.

A   Okay.

MR. TENNANT:  As a matter of fact, Judge, can we take a break for a second?

THE COURT:  No, let's go ahead and keep going.

MR. TENNANT:  Sure thing.  I was talking about for the -- maybe for the day?

THE COURT:  Just go ahead and --

MR. TENNANT:  Okay.

THE COURT:  Are you through asking questions?

A   I didn't -- I didn't -- ask that question again, so I can --

Q   (By Mr. Tennant) I can't.  As far as the truck and that sort of thing, that's not why we're here.  You're here because they found you guilty of a reprehensible crime.  And if they're going to consider at all allowing you to do something other than spend the rest of your life in prison, they have to know they're not making a mistake again.

A   Okay.  Well, I'll -- I'll just focus on that.

Q   Thank you.

A   All I can do is give you my word.  And my past record, minus this.  And my past record is that I have no convictions, no -- no prior felonies, never been -- never

been facing no penitentiary time or anything of that nature. Y'all find it in y'all heart to let me go.

Q Audrey's been around you since Jasmyn left, correct?

A Yeah.

Q Other girls at this church have been around you since Jasmyn left, correct?

A Yeah, they -- they still come to the house and stay. They'll fly in.

Q Nieces -- yeah, okay. Nieces, nephews, Elva's people --

A Well, let me --

Q -- your brother's people --

A Okay. Let me get something correct with that, too. It's not just good girls. Some of the guys that are 21, 22, 23 that was only 14, 15 year old at the time --

Q My son?

A His son. I -- I'm working out with his son --

Q 11.

A -- right now with basketball. And -- and -- so it's not just girls, you know. It's -- it's the young men also.

Q How old is my son?

A Theo -- 10 or 11?

Q 11.

A   11.  Just -- yeah, 11.  When I met him, he was 10.  And then I -- I coached a little dribbles [sic] basketball team, girls and boys.  And they parents --

Q   Any parent ever accuse you or any coaching staff --

A   None.

Q   -- anywhere of any impropriety with any kid?

A   Nope, not even -- not even the kids themselves. Some of the kids now are adults.  And they still call me, aye, coach, you know, we made it to the playoffs, would you come and watch us play.  Some of them now got scholarships, are in college.

Q   Stay on point.

A   I'm sorry.

Q   No, stay on point.  And this has been since Jasmyn that you coached my son, who's 11 now, and other people and other girls and other boys?

A   I only -- only coached -- I only coach and work out people that I know, personally.  Now, I done had people come to me and approach me and say, aye, I saw what you done in so and so kid, would you please work out with my kid.  If I don't know you personally -- because of what I'm going through, this changes your life.  It makes you think different.  It makes you paranoid.  It makes you not want to -- some of these kids don't have no reason for me

not to coach them or not to be around them, but I'm too scared because I don't know them. And I'm, like, if all it takes is for you to go say it and I get arrested, it makes you a little paranoid. You know, so right now I'm missing out an opportunity -- a huge opportunity to coach a team because of this. You know, and --

Q And, Andrew, medically -- medically, would you be able to actually coach that team?

A As long as they let me do like Phil Jackson, let me sit down. As long as I sit down, I'm okay. I can only sit down for a short period of time. And that's it. I can't travel with the team. And I told them that. I said, I can't travel, because it -- I wear a compressed stocking every day. If sit down too long, like these trips in the last two days, I'm -- I blow up like a fish. If I get a lot of fluid on me, which is dangerous because it travels, it can get in my heart and kill me. But I --

Q All right. How long do you have on the other hip? What's the stage -- I don't know what the term is mean, but maybe somebody does.

A It's called avascular necrosis. It's the deterioration of the hip. When I found out about my left, I was already a Stage 4, which is the worst it can be. On my right, I've been at a Stage 3. I've been recommended to do it. And the reason why I have not did it --

Tuesday, the doctor sent over a fax to George because of something I was having, to say, hey, he don't need to play with this, he need to get into the hospital now, and sent the fax over to George. And I told him, if it's going to push this trial back, I will risk it. Now, my wife did not agree with that at all, but I'm not dealing with nothing small. I'm dealing with life-threatening issues, but I did -- I knew if I go to the hospital, they was going to admit me. Because every time this happen, they got to pump heparin in me. And it's a -- it's a blood thinner they got to monitor. And I didn't want -- I just -- I just took the chance; and so far, beside me being full of fluid, I'm okay. I'm taking my shots.

This is what I will tell y'all: If you decide to come back with a verdict -- I mean, come back with a punishment of probation, it's something that you will not regret. I'm just not a troublesome guy. I'm just not.

Q You won't be able to deal with kids anywhere any more anyway. Continue, please.

A I love my wife. I love my church family. They've been extremely supportive. I love my brother. And if that's the price I have to pay to continue spending time with them, that's the price I have to pay with no problem. I never meant to cause no harm to nobody.

There's a reason why they call me a gentle giant. I'm really careful with my physique. I mean, let's just be real. I'm a big, black dude. If I say something a little too rough, it's overly intimidating. You're coming off too aggressive. So I didn't know how I was going to get through this. And that's the only reason why I didn't want to testify, because I just didn't want y'all to think, man, he's just a big, black angry dude. So far from the truth.

Summer, she -- she did a good job.

THE DEFENDANT: You did a great job. That's your job.

A But I have no doubt, if she was my defense attorney and George was over here, she would defend me just as strongly as she just tried to prosecute me -- well, not attempt, did -- because that's the job. And I -- I understand it. I respect it. Hurt my feelings with that monster call, but...

THE COURT: Any further questions, Mr. Tennant?

Q (By Mr. Tennant) Before --

MR. TENNANT: Pass the witness, Judge.

THE COURT: Pass the witness. All right.

Ms. Elmazi.

MS. ELMAZI: Thank you, Judge.

**CROSS-EXAMINATION**

BY MS. ELMAZI:

Q    Okay.  Mr. Pete, I don't think we actually got your name on the record.  So will you state your name and spell it on the record, please?

A    Yes, ma'am.  Andrew Pete, A-n-d-r-e-w; Pete, P-e-t-e.

Q    And you're the same Andrew Pete that was answering questions for Defense counsel, Mr. George Tennant, prior to me taking over and asking questions; is that right?

A    Yes, ma'am.

Q    I just want to make sure that's clear on the record.

All right.  So, Mr. Pete, you've been here throughout the last -- since last Wednesday.  You know that I am the Prosecutor handling this case.  I said this before to all of the witnesses that have testified, if there's something that I ask you that's not clear, you need to stop me and ask me for clarification.  Can you do that?

A    Yes, ma'am, I think so.

Q    All right.  So let's start with Cornisha.  You lived in Temple -- is it -- is it correct to say around 1999 you lived there?

A     The summer of 1999 is when I moved in, yes, ma'am.

Q     Okay.  And you met Patrice Riley?

A     '98.

Q     Okay.  And you were in a dating relationship with Patrice Riley?

A     Yes, ma'am.

Q     And you moved in with Patrice Riley and her two children, Cornisha and Marquis; is that right?

A     Yes, ma'am.

Q     And you lived with them for several years, correct?

A     No, ma'am.

Q     Okay.  How long did you live with them?

A     What do you mean by "several"?

Q     Well, more than one.  Well, let's clarify.

A     More than one, less than two.

Q     Okay.  So a year to two.  Between one and two years you lived with Patrice Riley and her two children?

A     Yes, ma'am.

Q     All right.  And you knew Cornisha when -- she testified that you knew her at least when she was in the seventh grade; is that correct?

A     Ma'am, I -- that I -- I don't -- I just know the years.  Now, what grade she was in at that time, I don't

know, but I know it was in '99.

Q   Do you recall her going to Sam Houston Middle School -- no, excuse me -- Lamar Middle school in Temple?

A   If that's the one by the park, then, yes, but I don't remember name of it.

Q   Okay.  Do you remember her going to Temple High School?

A   I wasn't -- I wasn't there when she was going to Temple High.

Q   Do you --

A   I mean, I was in the picture, but we wasn't living together.

Q   Okay.  All right.  But you were in the picture?

A   Yes, short period of time.

Q   When they testified that --

MR. TENNANT:  Summer gave me a lot of latitude.  And I'm doing the same, Judge.  But, again, same reason.  We're clearly not on trial again.  I stopped him every time he tried to go into the facts.

MS. ELMAZI:  It's cross-examination.  I get to go into that.

THE COURT:  Okay.

MR. TENNANT:  Okay, Judge.

THE COURT:  Overrule the objection.

MR. TENNANT:  I understand, Judge.

MS. ELMAZI: Thank you, Judge.

Q    (By Ms. Elmazi) So is it true when they said that you -- and your brother also testified that you worked at a dog food factory?

A    Doane's, yes, ma'am.

Q    Okay. So that's true. And you did work at -- at -- the night shift at Walmart?

A    That was in '99 when I first moved, because I was working at Walmart in Irving and transferred to -- to Temple.

Q    Okay. So then that is true. In Temple you worked at Walmart?

A    Correct, first.

Q    And you were together with Patrice at that time when you worked at Walmart?

A    We were dating, yes.

Q    Okay. Were you living with her?

A    Yes, yes.

Q    Okay. And that would mean you were also living with the kids?

A    Correct.

Q    Okay. And so you worked at night; is that correct?

A    Correct.

Q    And Patrice worked during the day?

A    Yes.

Q    Because she testified -- and I don't think it's been undisputed -- that she was a hairstylist, right?

A    Not when we first started dating.

Q    Okay.

A    When we -- when we first started dating, Patrice was still in school --

Q    Okay.

A    -- receiving welfare and was on Section 8.

Q    Okay.

A    So -- the picture that was painted that they, you know, well put together and just over the top successful, that -- that wasn't true because --

Q    Okay.

A    -- when I --

Q    Well, then, let's clarify that.

A    Okay.

Q    She was in beauty school --

A    Correct.

Q    -- is that correct?

A    Correct.

Q    And then she ultimately became a hairstylist?

A    Correct.

Q    All right.  And she was a hairstylist when she was dating with -- dating you at some point?

A    Correct, yes, ma'am.

Q    Okay.  All right.  And during your relationship with Patrice, you had access to -- you watched Cornisha and Marquis, correct?

A    Marquis.

Q    Or Marquis.  I'm sorry.

A    But -- yes.

Q    Thank you for correcting me.

A    Yes, ma'am.

Q    But you did babysit or watch Patrice's children?

A    I don't know about babysit.  They -- they were old enough -- I mean, they was, I think, 12 and --

Q    All right.  Let me clarify that question then. Did -- were you ever alone with Patrice's children?

A    Yes.

Q    All right.

A    Yes.

Q    And was there a time where there was a confrontation with you and Cornisha and her mother in which her mother asked you if you touched her after the dream?

A    That never happened.

Q    Okay.

A    I sat there and heard that -- I don't know nothing about -- about me rushing home and all -- that

never took place.

Q But you were working at Walmart at that time? When that -- when that alleged incident happened, you were working at Walmart at that time?

A According to their story, yes.

Q Okay. And this is all about stories, because you've been telling the jury that they -- they told a bunch of stories on you, right?

A Correct.

Q Okay. We'll get to the stories in just a minute.

A Okay.

Q But you did reside with them and you did -- and it's fair to say that you were a father figure to Cornisha and her brother?

A I -- I -- yeah. I mean, I was just being who I was.

Q You were a father -- I mean, she -- she told you she loved you. You would -- that's a -- that's because she felt like you were her dad.

A Okay.

Q Is that a fair assessment?

A Yes, I'm assuming so.

Q And you acted like a dad to her, correct, and her brother?

A    I was -- yeah, I guess so.

Q    Okay.  And then later on you got together -- after you broke up with Patrice, you moved to Irving -- or the Dallas area, correct?

A    Yes.

Q    And at that time you ultimately meet Tonia --

A    Yes.

Q    -- Jasmyn's mom?

A    2002, August to be exact.

Q    And then you and -- you, Jasmyn and Tonia, y'all all move in together?

A    Not till 2004.

Q    Okay.  But you did all move in together?

A    Correct.

Q    And you treated Jasmyn like your daughter?

A    Yeah, I guess so.  I mean, I --

Q    Well, you either did or didn't?

A    Yes, I did.

Q    I mean, your wife got up here and testified that you referred to her as your daughter and she called you Dad.  Is that -- is that a true statement or an untrue statement?

A    That is a true statement.

Q    All right.  And as a dad, with regards to Cornisha and to Jasmyn, what kind of things would you do

that a father would do?

A   Well, not just to -- with Cornisha.  It was with Marquis, too.

Q   Sure.  Okay.  That's fine.  Tell this jury how you were a dad.

A   Do you want me to do it combined or separate?

Q   Just tell this jury what you did that made these girls think you were a father figure to them.

A   Number one, I just take care of home.  I don't -- Trice (phonetic) as -- like right now, she's a clubber.  I don't go to clubs.  I'm not a --

Q   Okay.  I need you to answer the question.  My question to you is:  How were you a father figure to these children?  What did you do to make them think you were a dad and to say that you were a dad to them?

A   I was around.  I did -- I did what a father would do.

Q   What does a dad do?

A   I worked.  I came home.  I am a family-type guy, so we -- you know, random things.  Just -- whether we go to the movies together -- that's all of us.  Not just me and the kids, that's all of us.  Whether we go to the movies or let's go bowling together.  Anything that's family oriented, I just like to do.

Q   Did you give them -- did you give them guidance?

A    I tried my best.

Q    Did you give them advice?

A    Yes.

Q    And that's what they testified to, they were consistent with regards to that --

A    Yes.

Q    -- is that right?

A    Yes.

Q    Okay.  Now, it sounds like you -- you talked about multiple times -- you also mentioned, I think, your niece.  It must have hurt you pretty bad when you found out that Prosecutor in Jefferson Parish -- Jeff Parish – Jeff Davis?  What was the parish?

A    Jeff Davis.  Michael Cassidy, yes, ma'am.

Q    That Prosecutor decided he wasn't going to prosecute your niece's case, right?

A    Well, not prosecute the case.  I was upset because he would not let me remove her out of the environment.

Q    Okay.  Well, that's not what you testified earlier.  It sounds like the person who -- who hurt your niece, ultimately, was convicted of that offense; is that right?

A    Me and Mike Cassidy got in an argument because I was trying to prevent what happened to my niece from

happening. And they wouldn't let me remove her from the environment.

Q Okay.

A And then -- and then when it did happen -- when it did happen, I called and let him know. And he did apologize to me. And said he should have listened.

Q What -- so somebody didn't do what they needed to do for your niece that was in the government; is that right? The DA's office didn't do what they needed to do for your niece; is that right?

A Right.

Q Okay. Because that's what you testified to. And I want to make sure it's clear. So it must have been awful for you, as an uncle, to know your niece had been raped by some guy with HIV and nothing was being done to prosecute that person?

A Ma'am, you -- you -- you're mixing the two up.

Q Okay.

A So if you'll allow me to, I can clear it up for you because --

Q Please clarify.

THE COURT: Before he does that, we need to take a short break.

MS. ELMAZI: Sure. Okay.

THE BAILIFF: All rise.

THE DEFENDANT: Me, too, right? No?

THE COURT: Be seated.

(Court in recess; 4:32 - 5:21 p.m.)

(Open court, Defendant present, no jury.)

THE COURT: Okay. Let the record reflect this hearing is being held outside the presence of the jury in Cause Numbers F12-33559, F12-33560 and three -- F12-33561, all styled the State of Texas versus Andrew Pete.

The Defense has made a motion for mistrial with regard to the punishment phase of this trial. And I'm going to grant that motion for mistrial with regard to the punishment phase.

Let the record also reflect that the Defendant's bonds are still being deemed insufficient and that the Defendant will remain in custody.

Okay. If you would, please, bring the jury back.

(Proceedings concluded; 5:22 p.m.)

THE STATE OF TEXAS    )

COUNTY OF DALLAS      )


        I, Marissa Garza, Deputy Court Reporter in and for the 292nd Judicial District Court of Dallas County, State of Texas do hereby certify that the above and foregoing contains a true and correct transcription of all portions of evidence and other proceedings requested in writing by counsel for the parties to be included in this volume of the Reporters's Record, in the above-styled and numbered cause, all of which occurred in open court or in chambers and were reported by me.

I further certify that this Reporter's Record of the proceedings truly and correctly reflects the exhibits, if any, admitted by the respective parties.


WITNESS MY OFFICIAL HAND this the 11th day of August, 2015.




        __/s/ Marissa Garza_____
        Marissa Garza, CSR
        Texas CSR 7956
        Expiration:  12/31/15
        Official Court Reporter
        marissa.garza@dallascounty.org
        County Criminal Court No. 4
        Frank Crowley Courts Building
        133 North Riverfront Boulevard
        Dallas, Texas  75207

D I S C L O S U R E

Note:   Supreme Court Rule Adopted and Promulgated in Conformity with the Chapter 52 of the Government Code, V.T.C.A.

     Please be advised that pursuant to Supreme Court Rule IV, B.4. with regards to disclosure, I, to the best of my knowledge, have no existing or past financial, business, professional, family or social relationships with any of the parties or their attorneys which might reasonably create an appearance of partiality, except as follow:

_____

_____

_____


          /s/_MARISSA GARZA_____
          Marissa Garza, CSR
          Texas CSR 7956
          Expiration:  12/31/15
          Official Court Reporter
          marissa.garza@dallascounty.org
          County Criminal Court No. 4
          Frank Crowley Courts Building
          133 North Riverfront Boulevard
          Dallas, Texas 75207

*In re Andrew Pete, Relator*

**292nd CRIMINAL DISTRICT COURT**

**Cause No(s): F1233559; F1233560; F1233561**

# EXHIBIT "B"

# Writ of Habeas Corpus and Motion to Reinstate Bond

STATE OF TEXAS            §      IN THE 292nd CRIMINAL

VS.                       §      DISTRICT COURT OF

ANDREW PETE               §      DALLAS COUNTY, TEXAS

## WRIT OF HABEAS CORPUS AND MOTION TO REINSTATE BOND

**TO THE HONORABLE JUDGE OF SAID COURT:**

**NOW COMES,** ANDREW PETE, hereinafter referred to as Defendant, by and through his attorney of record, Scottie D. Allen, and makes this Writ of Habeas Corpus and Motion for Bond Reinstatement and would show:

I.

That Defendant is illegally restrained and confined of his liberty by the Sheriff of Dallas County in the Lew Sterrett Justice Center in Dallas, Texas.

II.

The Defendant is charged with three (3) offenses of Aggravated Sexual Assault, alleged to have been committed in this county. The court granted a mistrial, post-verdict, during the sentencing phase of the trial. Defendant's bond was revoked after having been found guilty; however, Defendant now makes this Writ contending the Court lacked the authority to order a mistrial as to punishment only therein requiring the Court to reinstate Defendant's bond.

III.

On April 22, 2015, the Court held a jury trial on the above entitled cause(s). On April 27, 2015, a jury found Defendant guilty on all three (3) causes and

proceeded to punishment; however, during sentencing the Court declared a mistrial "as to punishment only".

Defendant contends the Court lacked authority to grant a mistrial as to punishment only. *See State v. Boyd*, 202 S.W.3d 393 (Tex. App. – Dallas. Feb. 2007); *State of Texas v. Bounhiza*, 294 S.W.3d 780 (Tex.App.- Austin, August 20, 2009); *State v. Doyle*, 140 S.W.3d 890 (Tex.App.-Corpus Christi-Edinburg, July 22, 2004; and *State v. Huseman*, 17 S.W.3d 704 (Tex.App. – Amarillo, 1999) holding a Trial court's order granting defendant's oral motion for mistrial, after jury had returned guilty verdict, but before punishment phase of trial of trial had begun, restored case to its original posture before trial had commenced. Accordingly, the mistrial granted during this sentencing phase restored the case to its original posture.

The Court has referenced *State v. Stewart*, 282 S.W.3d 729, (Tex.App.-Austin, April 15, 2009) as their authority; however, this case is not directly on point and is distinguished by another case decided four (4) months subsequent to *Stewart* out of the same Appellate District. *See State v. Bounhiza*, 294 S.W.3d 780 (Tex.App.- Austin, August 20, 2009).

In *Stewart*, a Motio for New Trial (not mistrial)was granted, as to punishment only, subsequent to sentencing having been assessed. Furthermore, in that case counsel for Defendant only petitioned for a new trial as to punishment only, so the trial court was only addressing the issue before them.

In the present case, a mistrial was granted post-verdict, but before a sentencing had been assessed, therefore a Motion for New Trial was not

necessary and a mistrial restored the case to its original posture. As previously referenced, multiple Appellate Courts have addressed post-verdict mistrials and held the trial court lacked authority to grant a mistrial as to punishment only. *See State v. Boyd*, 202 S.W.3d 393 (Tex. App. – Dallas. Feb. 2007); *State of Texas v. Bounhiza*, 294 S.W.3d 780 (Tex.App.- Austin, August 20, 2009); *State v. Doyle*, 140 S.W.3d 890 (Tex.App.-Corpus Christi-Edinburg, July 22, 2004; and *State v. Huseman*, 17 S.W.3d 704 (Tex.App. – Amarillo, 1999)

IV.

In light of the mistrial and the requirement of the return to its original posture, the bond should be reinstated and Defendant be released immediately.

V.

No previous application has been made for the issuance of a writ of habeas corpus seeking the relief requested herein.

**WHEREFORE,** Defendant respectfully requests that this Court grant this Motion, restore the case to its original posture before commencement of the trial and issue a Writ of Habeas Corpus to the said Sheriff of Dallas County, directing and commanding her to produce and have the Defendant before this Court instanter, or at such time or place to be by this Court designated, then and there to show cause, if any she may have, why Defendant should not be discharged from such illegal confinement and restraint, or that he be allowed bail; and Defendant further prays and requests that he be allowed immediate bail, conditioned that he be and appear at said hearing to there await further orders of this Court.

Respectfully submitted,

*[signature]* To Scottie D. Allen
SCOTTIE D. ALLEN /Lysette R. Rios
4144 N. Central Expressway, Suite 650
Dallas, Texas 75204
Telephone: (214) 824-7711
Facsimile: (214) 824-7714
State Bar No. 01058020
**ATTORNEY FOR DEFENDANT**

## CERTIFICATE OF SERVICE

I hereby certify that a true and correct copy of the above and foregoing

**WRIT OF HABEAS CORPUS AND MOTION FOR BOND RESINTATEMENT** was

delivered to the Assistant District Attorney of Dallas County, Texas on the

4th day of _____Dcc._____, 2015.

*[signature]*
SCOTTIE D. ALLEN Lysette R. Rios

CAUSE NUMBER: F-1233559; F-1233561; and F-1233560

| | | |
|---|---|---|
| STATE OF TEXAS | § | IN THE 292nd CRIMINAL |
| | § | |
| VS. | § | DISTRICT COURT OF |
| | § | |
| ANDREW PETE | § | DALLAS COUNTY, TEXAS |

## NOTICE AND ORDER OF HEARING

The above Writ of Habeas Corpus and Motion for Bond Reduction is set for

a hearing on _____ at _____ in the

292nd Judicial District Court of Dallas County, Texas.


SIGNED on this _____ day of _____, 2015.


_____
For the District Court of
Dallas County, Texas

## VERIFICATION

**BEFORE ME**, the undersigned Notary Public, on this day personally appeared Lysette R. Rios for Scottie D. Allen, Attorney for the Defendant, who being by me duly sworn on his oath deposed and said that he is the Attorney for the Defendant in the above-entitled and numbered cause; that he has read the above and foregoing Writ of Habeas Corpus and Bond Reinstatement, and that every statement contained therein is with his personal knowledge and is true and correct.

LYSETTE R. RIOS

SIGNED under oath before me on the ___4th___ day of ___December___, 2015.

Notary Public, State of Texas

Debra Woolen Lipscomb
Notary Public,
State of Texas
Expires: 11-12-2018

Commission Expires: ___11-12-18___

CAUSE NUMBER: F-1233559; F-1233561; and F-1233560

| STATE OF TEXAS | § | IN THE 292ⁿᵈ CRIMINAL |
| | § | |
| VS. | § | DISTRICT COURT OF |
| | § | |
| ANDREW PETE | § | DALLAS COUNTY, TEXAS |

<u>ORDER</u>

On this _____ day of _____, 2015, came on to

be heard the Writ of Habeas Corpus and Motion for Bond Reinstatement in the

above numbered cause and same is as follows:

The court after hearing the evidence presented and arguments fro

the parties hereby orders and reduces the bond in this cause to the amount

of _____.

_____
JUDGE PRESIDING

THE COURT OF APPEALS FOR THE FIFTH SUPREME JUDICIAL DISTRICT

DALLAS, TEXAS

*In re Andrew Pete, Relator*

292nd CRIMINAL DISTRICT COURT

Cause No(s): F1233559; F1233560; F1233561

# EXHIBIT "C"

# Order Denying Writ of Habeas Corpus and Motion to Reinstate Bond

6 12 667

CAUSE NUMBER: F-1233559; F-1233561; and F-1233560

STATE OF TEXAS               §          IN THE 292nd CRIMINAL
                            §
VS.                          §          DISTRICT COURT OF
                            §
ANDREW PETE                  §          DALLAS COUNTY, TEXAS

## ORDER

On this ____4____ day of __December____, 2015, came on to

be heard the Writ of Habeas Corpus and Motion for Bond Reinstatement in the

above numbered cause and same is as follows:

The court after hearing the evidence presented and arguments fro

the parties hereby orders and reduces the bond in this cause to the amount

of _____.

_____
JUDGE PRESIDING

*Motion denied.*

THE STATE OF TEXAS
COUNTY OF DALLAS

I, Felicia Pitre, District Clerk of
Dallas County, Texas, do hereby certify
that the foregoing is a true and correct
copy as the same appears on record now
on file in my office.

Witness my official hand and seal of
office, this DEC 16 2011

FELICIA PITRE, DISTRICT CLERK
Dallas County, Texas

By: _____
Deputy

# THE COURT OF APPEALS FOR THE FIFTH SUPREME JUDICIAL DISTRICT

## DALLAS, TEXAS

*In re Andrew Pete, Relator*

## 292nd CRIMINAL DISTRICT COURT

## Cause No(s): F1233559; F1233560; F1233561

# EXHIBIT "D"

# Notice of Appeal

CAUSE NUMBER: F1233559; F1233560; F1233561

| | | |
|---|---|---|
| STATE OF TEXAS | § | IN THE 292nd CRIMINAL |
| | § | |
| VS. | § | DISTRICT COURT OF |
| | § | |
| ANDREW PETE | § | DALLAS COUNTY, TEXAS |

## NOTICE OF APPEAL

TO THE HONORABLE JUDGE OF SAID COURT:

COMES NOW, ANDREW PETE, the Defendant in the above referenced cause(s) by and through his attorney of record, Scottie D. Allen, and that he here and now in open Court gives Notice of Appeal to the Texas Court of Appeals for the Fifth Supreme Judicial District of Texas at Dallas, Texas.

Specifically, Defendant appeals the Order dated December 4, 2015, wherein this Court denied his Writ of Habeas Corpus and Motion for Bond Reinstatement in the above referenced causes.

Further, this Defendant would respectfully request an abatement of any further proceedings until this matter is decided by the Texas Court of Appeals.

Respectfully submitted,
THE ALLEN LAW FIRM

_____
Scottie D. Allen
4144 N. Central Expressway
Suite 650
Dallas, Texas 75204
Telephone: (214) 824-7711
Facsimile: (214) 824-7714
SBN: 01058020
**ATTORNEY FOR DEFENDANT**

_____
Defendant, Andrew Pete